(No. 33917.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HELEN JOAN RYAN, Plaintiff in Error.

*Opinion filed November 26, 1956.*

WESTON AND KEENAN, of Rockford, (MAX A. WESTON, of counsel,) for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and ROBERT R. CANFIELD, State's Attorney, of Rockford, (FRED G. LEACH, EDWIN A. STRUGALA, and ROSARIO A. GAZIANO, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

By this writ of error Helen Joan Ryan, hereinafter referred to as defendant, seeks a reversal of a judgment entered in the circuit court of Winnebago County wherein she was found guilty of involuntary manslaughter and sentenced to serve three to ten years in the Illinois State Reformatory for Women.

Defendant was indicted on a two-count indictment charging her with murder and manslaughter. Both counts charge that death was caused by wrapping a new-born baby in a towel and placing it in an overnight case, thereby producing death due to obstruction of blood aeration. A motion to quash the indictment was denied, and she pleaded not guilty. The trial before a jury resulted in a verdict finding defendant guilty of involuntary manslaughter. Motions for a new trial and arrest of judgment were subsequently overruled and defendant was sentenced as aforesaid.

The principal error assigned in this review is lodged in a factual controversy, so we will relate the circumstances surrounding the homicide rather fully. In July, 1955, the defendant, an unmarried woman of 27 years of age, resided in Rockford, Illinois, with two other young ladies. She had been a registered nurse since 1950, employed in that capacity by two doctors and had from time to time assisted in the prenatal care of pregnant women. Defendant had known since January that she was pregnant, and that it was fast approaching the time when her child would be born.

The three-room-and-bath apartment then occupied by the defendant and other young ladies was so arranged that defendant and one Carol Fiebelkorn shared the same bedroom each having separate beds. The bathroom adjoined the bedroom. A third young lady slept in the living room.

About 3 A.M. on Saturday, July 30, defendant went to the bathroom unattended, and shortly thereafter the

baby was born. Before its arrival defendant had prepared two lengths of heavy crochet thread, washed a pair of scissors in soapy water, put a supply of newspaper in the bathroom and placed a large beach towel on the bathroom floor upon which to lie. Previously she had placed a small empty overnight case in the bathroom behind the bathtub. This overnight case was just large enough to contain the wrapped body of a baby and could be locked tightly with a key. Defendant had this key along with other keys on a chain in the pocket of her bathrobe which she had on when she went to the bathroom to give birth to the child.

Immediately after the child was born, defendant tied the umbilical cord in a manner to protect both mother and child and cut the cord between the two tied places. She then took the normal steps for her own protection, wrapped the placenta in the newspaper and put it in the wastebasket in the bathroom. Thereafter she baptized the child with cold water from the bathroom faucet. Some 45 minutes after birth she wrapped the child in the beach towel upon which she had been lying. She then put the wrapped child in the overnight case, closed the lid, turned the key and left it in the bathroom. She thereafter went back to bed. Later, on Saturday morning and before her roommates awakened, defendant took the wastebasket to the trash can and burned the contents, leaving the overnight case and its contents in the bathroom.

Defendant worked her regular hours on Saturday at the doctor's office where she was employed. On Saturday evening she unlocked and opened the overnight case briefly, then closed and relocked it. The baby remained locked in the overnight case until approximately 1:30 o'clock the following Sunday afternoon when she removed the body of the baby from its container, unwrapped it from the beach towel, rewrapped it in a sheet, wrapped newspapers around it, put the bundle in a paper shopping bag and tied the whole with a cord. The beach towel was wrapped in

a second package. Defendant then took the shopping bag containing the baby's body just outside the house and buried it in a shallow grave.

On August 17, 1955, defendant went to the offices of a charity in Rockford at the request of a caseworker. She told the caseworker that she knew why she had been sent for, began to cry, saying that she had become pregnant out of wedlock, had delivered a baby herself and had buried it. The caseworker took her to the juvenile probation officer where she was met by two policewomen, Bernice Olson and Gloria Nelson, who questioned her at length and to whom she told substantially the same things, drawing for them a diagram of the place where she had buried the baby. Thereafter defendant gave a statement which was typed by policewoman Olson and signed by defendant.

Later that afternoon the two policewomen accompanied by three detectives, the coroner and two newspaper photographers went to the location defendant had indicated on the diagram. Three or four inches below the surface of the ground, the coroner uncovered a paper-wrapped package with a strong odor. He took this package to Dr. Paul Van Pernis, a pathologist and a director of the Swedish-American Hospital laboratory. Dr. Van Pernis unwrapped the package and found a full-term female baby approximately eight pounds in weight upon which he performed an autopsy.

After the finding of the baby's body, the two policewomen returned to the police station and again discussed the matter with defendant. Whereupon, the defendant gave a second signed statement to policewoman Nelson who typed the same.

The position of defendant was that the baby, if born alive, was dead at the time she wrapped it in the beach towel and placed it in the overnight case and that death was due to natural causes.

The first error urged is that the evidence in this case

failed to prove the *corpus delicti* beyond a reasonable doubt, in that it does not show that the death was caused by the criminal agency of the defendant. It is earnestly argued by defendant that no evidence was submitted as to the cause of death.

To establish the *corpus delicti* in a prosecution for the killing of a new-born child two elements must concur, namely, birth of the child alive and death resulting from a criminal agency. These ingredients of the crime must be proved beyond a reasonable doubt, and can be established by direct or circumstantial evidence.

Policewoman Bernice Olson was called by the People. On direct examination she testified that she along with policewoman Gloria Nelson had first talked to defendant on August 17, 1955, in the juvenile probation officer's office. On that occasion defendant was asked whether or not the baby had cried and defendant said she didn't know whether the baby cried or not. Defendant was asked if it had moved and defendant said she thought the baby was dead. After the preliminary questioning, witness prepared and defendant signed a written statement and drew a rough map showing the location of the baby. Thereafter defendant was incarcerted while the authorities exhumed the body. Later the same day the witness talked to defendant again. On this occasion the witness testified, "We asked her again if she had noted whether or not the baby had lived or if it had made any sound or if it had moved in any way at the time of its birth. She said yes, that it had. That it cried once, that it had moved its little arms." On cross-examination the witness reiterated the testimony given on direct examination. When interrogated by counsel for defendant regarding this question asked her at the coroner's inquest: "In her expressions to you, was she conscious of wrapping the baby alive?" Witness admitted she had answered by saying: "She didn't know whether the baby was alive or not, but she thought it wasn't."

Dr. Van Pernis, a pathologist, was called and testified that he performed an autopsy on the baby in question, which had been dead at least 24 hours and perhaps longer. The external appearance indicated it had been buried a longer time. The child was a full-term female, approximately eight pounds in weight and normal length. He also determined the presence of gas, actually air, in both lungs which were fully expanded. The presence of gas, he stated, could come from two main sources: It indicates that the body had recently been alive or that there is decay present by bacteria and other organisms which may produce gas. In his opinion the infant had been alive because the lungs were fully expanded, filling the chest cavity on both sides. He explained that ordinarily in a new-born baby which has not been alive, the lungs are collapsed and are in the middle of the chest leaving a considerable space between the lung tissues and the chest wall itself; that in the body under consideration there was no evidence any place in the lungs that there was any collapse of tissue. He determined that the umbilical cord was still present and that it had probably been tied with a black string-like material. He further testified that in his opinion death had occurred relatively soon after birth as the bones of the skull were overriding. It was his opinion that the child did live and breathe. On cross-examination he testified he could not determine with any degree of medical certainty how long the child had lived. Dr. Van Pernis did not give and was not asked if he was able to determine medically as to what was the cause of death.

Policewoman Gloria Nelson testified on direct examination that after the body of the child had been exhumed, she, together with policewoman Bernice Olson, had a second conversation with defendant as to whether or not the baby was alive after birth. The witness said defendant told her it had cried and that she had seen its arms move. When questioned regarding preparation of the second statement

the witness testified that she typed it from what defendant told her. On cross-examination the witness testified defendant told her that when she wrapped it in the beach towel she didn't know whether it was living or dead.

Two statements by defendant, both dated August 17, 1955, were admitted into evidence. The statements for the most part were identical in the events leading up to the birth. In the first statement she says "as far as I know the baby did not cry and it did not show any signs of life. After birth, the baby remained curled up." The second statement, taken after the autopsy, is identical up to this point, but contains at this point the statement, "I heard the baby cry once and I became panicky. I saw it move its little arms. I did not look to see what sex it was. The baby remained curled up. Although I knew it was living when born, I did nothing to try to keep it alive. I started crying myself then." In the second statement, these damaging admissions appear: "I knew when I was wrapping the baby in the beach towel that I was doing wrong for I knew that the baby had lived as I heard it cry and saw it move. I made no effort to keep it alive and was not sure when I wrapped it in the towel whether it had died or was still breathing. I am a registered nurse and am very familiar with birth and the details it involves." The second statement then concluded, "My other statement was partly true but not entirely. This statement is the truth."

Carol Fiebelkorn, one of the defendant's roommates, testified that on the morning in question she came home about 2:45 A.M., heard defendant crying and that she heard her get up and go to the bathroom; that witness went to sleep and half an hour or 40 minutes later woke to hear two or three baby cries, that at the time she did not know if she actually heard it or had dreamed it. She did not get up to investigate.

Defendant took the stand in her own behalf, testifying to her education, family background, employment, and the

ascertainment on her part of her pregnancy. With reference to the events leading up to the birth of the baby her testimony for the most part closely parallels the two statements given the policewomen. When she cut the umbilical cord, she testified: "The arm of the baby slightly moved. Whether it was from a reflex motion of cutting the cord or not, I don't know. I don't remember the baby crying at all." "And realizing the baby had not moved and not realizing whether it had cried or not, I baptized it with water from the faucet in the bathroom."

She further testified that the water was cold water and that the baby did not move or cry when she baptized it. In answer to the question as to why she baptized the baby, she replied, "I baptized the baby because I thought it was dead. In fact, I was sure it was dead because it did not move." She further testified that when she wrapped the baby in the beach towel she believed the child was dead.

On cross-examination defendant testified she had tied the umbilical cord as she had been taught, so that neither she nor the baby would suffer from the cutting of the cord, and that at least 45 minutes had elapsed after the birth of the baby before she wrapped it in the beach towel. She was asked "had you made any preparation for the care of this child after it was born?" Her testimony on this point was at best evasive.

On redirect examination defendant was interrogated on the difference between the first and second statements. She testified that insofar as the second statement differed from the first statement she did not remember telling the policewomen the things contained in the second statement and that those things were not true.

Giving fair consideration to the testimony of the defendant, her signed statements and conversations with the two policewomen, the testimony of the roommate touching the cries of the infant, and the pathologist who expressed an opinion on the subject, we are of the opinion that the

proof clearly established the fact that defendant's baby was born alive.

In support of her second contention that the State failed to prove that the child came to its death by other than natural causes, defendant relies particularly on her own testimony and the fact that the pathologist did not and was not asked if he was able to ascertain medically as to what was the cause of death. The defendant, in testifying in her own behalf, said she made no effort to ascertain whether the baby was alive or dead, but that when she wrapped it in the beach towel she believed it was dead. In her second signed statement she said, "I made no effort to keep it alive and was not sure when I wrapped it in the towel whether it had died or was still breathing." Yet the defendant wrapped the infant in the beach towel and placed it in a closed and locked overnight case.

There is no doubt that the infant was wrapped in a beach towel, and it is common knowledge that death by suffocation could have resulted from this act before the child was placed in the overnight bag. It is likewise common knowledge that the act of placing the infant in the overnight case and locking it in there would also be sufficient to cause death.

Regardless of defendant's real belief, or the absence of actual malice, the reckless and wanton disregard for the welfare, safety and life of her infant daughter constitutes criminal neglect which, resulting in the death of the infant, is cognizable under section 145 of division I of the Code, (Ill. Rev. Stat. 1955, chap. 38, par. 363,) which reads as follows: "Involuntary manslaughter shall consist in the killing of a human being without any intent to do so, in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: Provided, always, that where such involuntary killing shall happen in the commission of an unlawful act, which in its consequences naturally tends to destroy

the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder." Where the evidence is such that the defendant might have been convicted of murder under this section, the defendant may nevertheless be convicted of manslaughter and cannot complain because the jury convicted her of the lesser offense. *People* v. *Tilley,* 411 Ill. 473, 479, cert. denied, 344 U.S. 824; *People* v. *Carrico,* 310 Ill. 543, 545-6. The question is principally for the jury.

As a further ground for reversal of the judgment herein, defendant contends that the trial court erred in giving and refusing instructions. Counsel presented to the court 88 instructions, the State offering 51, of which 37 were given, and the defendant offering 37, 27 of which were given as tendered. Many of the instructions were inapplicable, others were substantial duplicates. In *People* v. *Burns,* 300 Ill. 361, this court made observations that are strikingly appropriate: "Counsel have little room to complain of error in instructions where they burden the trial court with the labor of weeding out a lot of miscellaneous stock instructions in the short time available for this task of the court. Repetition should be carefully avoided in instructions in a criminal case. Enough instructions should be given to cover the law of the case and no more. When propositions of law are repeated in different language in a number of instructions there is a great danger of error and the repetition only tends to confuse the jury."

For the State, the court gave three instructions on voluntary manslaughter. Instructions 40, 42 and 43 were, with the change of a few words, exact duplicates. Instructions 44 and 45 tendered on behalf of the State and given by the trial court define involuntary manslaughter in almost identical language. This court has often criticized this practice. *People* v. *Heard,* 305 Ill. 319; *People* v. *Burns,* 300 Ill. 361; *People* v. *Moses,* 288 Ill. 281; *People* v. *Miller,* 292 Ill. 318; *People* v. *Sawhill,* 299 Ill. 393.

To discuss other errors urged and argued would be to lengthen this opinion without resulting benefit. There is no complaint of the conduct of the State's Attorney, the jury or the court. The proof adduced herein and the applicable legal principles have been considered with anxious attention, but we are forced to the conclusion that the case has been well and fairly tried and that no errors have intervened that would justify a reversal. We therefore affirm the judgment of the circuit court of Winnebago County.

*Judgment affirmed.*