THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TERRY LEE BOLAR, Defendant-Appellant.

Second District   No. 80—963

Opinion filed September 21, 1982.

LINDBERG, J., dissenting.

Frank P. Vella, Jr., of Rockford, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and
Paula R. Johnson, both of State's Attorneys Appellate Service Commission,
of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

The defendant, Terry Lee Bolar, was charged by information with the crime of reckless homicide (Ill. Rev. Stat. 1979, ch. 38, par. 9—3). He was convicted of this offense having waived his right to trial by jury and proceeding to trial before the trial court. He maintains on appeal that his conviction should be reversed because it was not proved beyond a reasonable doubt (1) that the victim was an individual within the contemplation of the statute; (2) that he was intoxicated at the time of the offense; or, (3) that his intoxication was the cause of the accident which served as the basis of the conviction. We affirm.

In the early morning hours of May 3, 1980, Timothy and Kelly Oswald were driving to their home in Rockford, Illinois. Timothy was driving and Kelly was seated in the front passenger seat. At that time Kelly Oswald was somewhat more than eight months pregnant.

When the Oswald's vehicle entered the intersection of 20th Street and 12th Avenue, it was struck on the driver's side. The defendant, Terry Bolar, failed to stop for a stop sign located at 12th Avenue. His vehicle struck the Oswald's vehicle at a speed in excess of 30 miles per hour.

Kelly suffered some minor lacerations and abrasions and experienced abdominal pain. She and her husband were taken to Rockford Memorial Hospital.

The Rockford police arrived at the intersection shortly after the accident. At trial Officer Miller testified that he had noted "a very strong odor of alcoholic beverage" on the defendant. He also testified that the defendant was "staggering," and made several unsolicited statements to the effect that he had had only "a couple of beers." The defendant had fallen asleep while in the squad car and again during the bonding procedures at the police station. Officer Kaske testified to substantially the same observations and that the defendant's speech was slurred and eyes watery and bloodshot. Both testified that in their opinion defendant was intoxicated.

In the meantime Kelly Oswald was treated in the emergency room at Rockford Memorial Hospital. Monitoring the fetal heart disclosed that the baby's heartbeat was strong. Kelly Oswald at that time was released by the emergency room staff and joined her husband who was being treated in another room. Some time later, the record being unclear as to the exact time, Mrs. Oswald's abdominal pains worsened. While walking with her parents in the hospital she commenced to bleed vaginally and was placed under the hospital's care again. She was placed in the high risk obstetrical ward at about

4:30 a.m. The fetal heart monitor at that time registered a fetal heart rate of 140 beats per minute which was considered normal.

Dr. McHugh, Kelly Oswald's physician who was ministering to her obstetrically, was summoned to the hospital. He testified that upon his arrival at the hospital at approximately 5 a.m. the fetal heartbeat was 140 beats per minute. By 6:45 a.m. the fetus' heartbeat had fallen to 115 beats per minute and Dr. McHugh called in a consultant. While the consultant was examining Kelly Oswald the baby's heart rate dropped off "even more dramatically."

Kelly Oswald's condition was diagnosed as *placenta abruptio, i.e.*, the separation of the placenta from the uterine wall. When the placenta is separated from the uterine wall prematurely the fetus' oxygen supply is cut off. Dr. McHugh testified that a fetus would expire if placental separation were complete enough.

Approximately 7:50 a.m. the doctors performed a cesarean section on Kelly Oswald. At 8 a.m. the fetus was removed from her uterus. At this time the baby was handed to Nurse Sally Craig by Dr. McHugh. Dr. McHugh was acting as the pediatrician attending the baby at that time. Nurse Craig had previously been instructed by Dr. McHugh to determine the heartbeat to see if they should proceed with resuscitation measures. Nurse Craig at that point measured the heartbeat and based upon a timing over a 15-second period established that there was a rate of about 50 heartbeats per minute, and they were "regular and faint." She advised Dr. McHugh of the heartbeat and to go ahead with resuscitation measures at that time. The infant was flaccid, did not move and made no apparent effort to breathe. Oxygen was administered and the doctors attempted to "resuscitate" the infant. After two minutes, Nurse Craig again measured the heart rate. She heard "two beats slow and then three little like a flutter beat, and then it stopped." Dr. McHugh continued to resuscitate while Nurse Craig passed the stethoscope to another nurse standing there who stated she could hear "nothing." The stethoscope was then passed to Dr. McHugh, and at that time resuscitation efforts were stopped. The infant was pronounced dead shortly after 8 a.m.

Several physicians offered expert testimony at trial. Dr. McHugh based his opinion upon his knowledge of Kelly Oswald's pregnancy, the circumstances of the collision, and his observation during the cesarean section, and stated that the placental separation could have been caused by the impact. He also testified that in his opinion the infant, Misty Oswald, had been "born alive" as that term is defined by the Vital Records Act (Ill. Rev. Stat. 1979, ch. 111½, par. 73—1 *et seq.*) and that he certified the birth accordingly. He testified that he

had operated under the definition of live birth as set forth in said act for years. He further testified that he would have registered the infant as a live birth had there been but a single heartbeat.

Dr. McHugh testified that based upon the "Apgar Scale" he assessed Misty's condition as a one. He testified that the "Apgar Scale" is an assessment procedure used by physicians to gauge the vitality of newborn infants. Dr. McHugh explained that within one minute of birth an attending physician observes the color, pulse, respiration, temperature and muscle tone of a newborn, and, based upon these indications, assigns an "Apgar Scale" score on a scale of one through 10. An "Apgar Scale" of 10 would indicate good health, while a rating of eight or nine would be applied to an infant who is "very blue but pulling well." An "Apgar" score or five of six is associated with compromised respiration and signals "serious trouble." In the case of Misty Oswald, the only hint of life was a slow, faint pulse, and consequently Dr. McHugh had assigned her an "Apgar" of one.

During cross-examination, Dr. McHugh noted that a fetus' heartbeat could continue after partial separation of the placenta from the uterine wall. He also testified that upon physical separation from the mother a newborn supports its separate circulatory system through respiration. Dr. McHugh also indicated that a heartbeat could occur in the absence of any brain activity. He further testified that, in his opinion, this baby's brain was irreversibly damaged at the time of her birth.

Dr. William Rouse, the pathologist who performed the autopsy, also testified for the State. He stated that he found no evidence of internal or external abnormalities in the infant's physical development. He concluded that the cause of death was hypoxia, a deficiency of oxygen. In Dr. Rouse's opinion, this condition was caused by the accident.

Testimony was adduced concerning the medical standard which defines death as a demonstrable absence of brain activity as set forth under the Uniform Anatomical Gift Act (Ill. Rev. Stat. 1979, ch. 110½, par. 302). Dr. Rouse testified that a heartbeat may exist in a newborn despite the absence of brain activity. He also testified that the presence or absence of brain activity could not be deduced from the fact that the infant exhibited some heart action. However, had the infant demonstrated both a heartbeat and any one of the other "Apgar" factors, Dr. Rouse testified that he would have concluded that she had demonstrated "brain life."

Dr. Seward, the coroner of Winnebago County, testified. He testified he was a general practitioner of some years experience having

delivered over 600 children. In response to a hypothetical question he testified, based upon what he understood to be commonly accepted and contemporary medical standards, that the baby was born alive. Further, when inquired of as to the criteria of the Vital Records Act his testimony was that "since there was a noted heartbeat, that would be defined as a live birth." He further gave an opinion that because there was a "detection of heartbeats" there would be an independent circulatory system.

On re-cross-examination Dr. Seward was asked a hypothetical question, which, in part, assumed a definition of live birth to be as follows: "That the fetus must survive long enough to be born and take a single breath—." The hypothetical also assumed that there were no respiratory impulses detected. The doctor answered: "Using those standards, the child would be dead—." He added, however, if such definition were used, there would be a lot of babies walking around that would have been dead, for it was common that babies do not have spontaneous respiration and you have to resuscitate them, but they have heartbeats.

The State took the position that the infant had died as a result of a prenatal injury and that the defendant was criminally liable for that injury due to the fact that "life had persisted after the delivery of the child." The State urged the trial court to find that the Vital Records Act provides a legislative definition of life for the purposes of our Homicide Statute. The defendant, in turn, emphasized "brain life" claiming that that standard was both medically workable and afforded a more rational basis for criminal liability.

Defendant offered no expert medical testimony except that of Dr. Rouse, who was recalled.

The trial court found the defendant guilty of reckless homicide. He found that the defendant had driven at an unreasonable speed, through a marked stop sign, while intoxicated and that these acts constituted reckless acts. The court relied upon the testimony of the expert witnesses, noting that Dr. McHugh based his opinion of what constitutes a live birth upon the Vital Records Act and that Dr. Seward went beyond this and that according to common medical practice felt there was a live birth notwithstanding the Vital Records Act. The court noted the defense's position of the applicability of the Uniform Anatomical Gift Act and rejected this standard. He ruled that the Vital Records Act's definition of live birth which includes the heartbeat is the Illinois definition of live birth and is also applicable to criminal law. The court noted that there was more than just one faint heartbeat, and under the factual situation presented in the case be-

fore him he was of the opinion there was a live birth. The defendant was sentenced to one year of periodic imprisonment.

The defendant basically raises two issues on appeal. First, he contends that the trial court erred in finding that the infant, Misty Oswald, was an individual within the meaning of the Illinois involuntary manslaughter and reckless homicide statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—3), which provides in relevant parts:

> "(a) A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of the death consists of the driving of a motor vehicle, in which case the person commits reckless homicide."

Defendant also claims that the State failed to prove beyond a reasonable doubt that he was intoxicated and that his intoxication resulted in a reckless act. The first issue presents a question of first impression in the State of Illinois: whether a newborn who, at the time of delivery, exhibits only a few heartbeats which decline in rate and then terminate within minutes is to be considered to have been an individual under the provisions of our involuntary manslaughter and reckless homicide statute. We note that the legislature recently amended the Criminal Code of 1961 to include the offense of feticide. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1.) However, this act came into effect more than nine months after the defendant's conviction. The new act would, in a close case, allow for prosecutorial discretion in the charging of a crime, yet we still are confronted with the issue as to what constitutes being born alive.

The common law, as well as Illinois law, is quite clear; a child cannot be the subject of a homicide unless it is born alive and expires as a result of the injuries previously sustained. (*People v. Greer* (1980), 79 Ill. 2d 103, 111, 402 N.E.2d 203; 3 Coke, Institutes *50; 1 Blackstone, Commentaries *129-30; 1 Hales, Pleas of the Crown 433 (1800).) Both of these elements, *i.e.*, being born alive and death as a result of a criminal agency, must be proved beyond a reasonable doubt. (*People v. Ryan* (1956), 9 Ill. 2d 467, 138 N.E.2d 516.) In the case before us it seems quite clear that the second element was proved beyond a reasonable doubt. The infant, Misty Oswald, died of hypoxia as a result of a placental separation proximately caused by the reckless act of this defendant. The controversy in this appeal centers upon whether the record justifies a finding that the infant was, beyond a reasonable doubt, born alive. The trial court basically agreed

with the State's theory that the Vital Records Act (Ill. Rev. Stat. 1979, ch. 111½, par. 73—12) embodies the definition of live birth. The Vital Records Act has a requirement that every live birth occurring within the State is to be registered with the State authorities. (Ill. Rev. Stat. 1979, ch. 111½, par. 73—12.) Live birth as defined by the Act occurs when a fetus is separated from its mother and "breathes *or shows any other evidence of life such as beating of the heart,* pulsation of the umbilical cord, or definite movement of voluntary muscles ***." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 111½, par. 73—1(5).) The defense urges a theory which conditions the finding of live birth on the presence of brain activity a standard roughly based upon the Uniform Anatomical Gift Act (Ill. Rev. Stat. 1979, ch. 110½, par. 302).

It appears that the common law would require that a child be completely delivered and have established an existence which is separate and independent from that of the mother. See, for example, *R. v. Caroline Burns* (1863), 57 Cent. Cr. Ct. 585; *State v. Winthrop* (1876), 43 Iowa 519; *Morgan v. State* (1923), 148 Tenn. 417, 256 S.W. 433; Meldman, *Legal Concepts of Human Life: The Infanticide Doctrines,* 52 Marq. L. Rev. 105 (1968); 1 Blackstone, Commentaries *129-30.

Necessarily, focus would be on the presence of some mechanical bodily function as an indicator of life. The resolution of these physical factors as to whether they determine there was life is a question for the trier of the fact. Criminal liability is conditioned upon whether the infant survived long enough to manifest the required bodily function. We are aware of the anomalous result which may obtain from such a focus, however, American courts including our own supreme court have in the absence of specifically inclusive statutory language unanimously refused to abandon this born alive rule in criminal cases. (See *People v. Greer; State v. Brown* (La. 1979), 378 So. 2d 916; *State v. Larsen* (Utah 1978), 578 P.2d 1280.) The anomaly persists whether we require a heartbeat, brain activity or breathing as a predicate for criminal liability.

In *Keeler v. Superior Court* (1970), 2 Cal. 3d 619, 627, 470 P.2d 617, 87 Cal. Rptr. 481, 485, 621, it was stated:

> "Of these decisions, some pointed out that evidence of breathing is not conclusive because that function may begin before the infant is fully born (*Poulton, Enoch, Sellis*), while others observed that the infant can possess an 'independent circulation'—one of the tests used to determine live birth—even though the umbilical cord may not yet be severed (*Reeves, Tril-*

*loe*). But all were in agreement that *however live birth was to be proved*, unless that event had occurred before the alleged criminal act there could be no conviction of homicide." (Emphasis added.)

■ Is it necessary to establish certain criteria which would serve as the basis upon which it is determined that life exists separate and apart from the mother? We think not. There appears to be a pitfall in each of the customary criteria used to signify life. However, a live birth must be proved before a conviction may be had. Therefore this should remain a fact question for the trier of fact to determine upon his evaluation of all the facts and circumstances surrounding the birth.

Defendant's contention that brain activity be required for a finding of live birth is a luxury that is impossible to afford. Testimony at trial indicated that this could only be conclusively established through use of an electroencephalogram. Though no testimony was adduced we believe that constraints of time, availability of equipment, and incompatability with life-saving measures renders this requirement totally impractical.

In *Morgan v. State* (1923), 148 Tenn. 417, 420-21, 256 S.W. 433, 434, the court held, in discussing if a child is born alive, that "[i]t cannot be the subject of a homicide until it has an existence independent of its mother. It is usually said that the umbilical cord must have been severed, and an independent circulation established." Here, the unrebutted evidence establishes that after the umbilical cord was severed this child's heart continued to beat and circulate her blood for approximately two minutes. There was testimony that after the birth the child had a regular heartbeat of 50 per minute. Dr. Seward testified on direct examination that the child had established an independent circulatory system because of its heartbeat. Medical testimony indicated at this moment the child had an existence independent of its mother, as fragile as it might be. The fact that the infant expired within moments thereafter is irrelevant. *Greer*, which is distinguishable from the case before us because it is concerned with an unborn fetus, stated that the child need only survive for a few moments, "long enough to be born and take a single breath" for the defendant to have committed a homicide. *People v. Greer* (1980), 79 Ill. 2d 103, 111, 402 N.E.2d 203.

■ Here, the trial court, acting as a finder of fact, found that the child was born alive. It had expert medical testimony establishing that fact. The three doctors testifying did not testify that the child was still-born, but was born live. There was no rebuttal of medical testi-

mony. In *People v. Powell* (1978), 72 Ill. 2d 50, 65, 377 N.E.2d 803, *cert. denied* (1979), 440 U.S. 907, 59 L. Ed. 2d 455, 99 S. Ct. 1215, it was stated:

> " '[W]here a case is tried by the court without a jury, the determination of the credibility of the witnesses and the weight to be accorded their testimony is committed to the trial judge; and, unless it can be said that the court's judgment is found to rest on doubtful, improbable or unsatisfactory evidence, or clearly insufficient evidence, a reviewing court will not substitute its judgment for that of the court below even though evidence regarding material facts is conflicting and irreconcilable. (*People v. West*, 15 Ill. 2d 171.)' *People v. Clemons* (1962), 26 Ill. 481, 484. This rule is well settled in Illinois. (See *People v. Jones* (1975), 60 Ill. 2d 300, 307; *People v. Fleming* (1971), 50 Ill. 2d 141, 145.)"

Here the trial court saw and heard the witnesses. It found the evidence was sufficient to establish that the infant, Misty Oswald, was born alive. We do not disturb that finding.

■■ ■ The other contentions of the defendant are that there was not proof beyond a reasonable doubt of the reckless acts alleged, nor that he was under the influence of intoxicating liquor, and that there was no proof that the degree of intoxication and evidence affected his ability to drive.

> "However, a charge of reckless homicide may be justified by a combination of excessive speed and other circumstances which would indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others, and the circumstances are such that a reasonable person would act differently under the same situation. (*People v. Baier* (1964), 54 Ill. App. 2d 74, 78, 203 N.E.2d 633, 634, 635.)" (*People v. Bonzi* (1978), 65 Ill. App. 3d 927, 931-32, 382 N.E.2d 1300, 1303.)

One such "circumstance" is that the accused was intoxicated at the time of the incident. (65 Ill. App. 3d 927, 932.) There was ample evidence from two Rockford police officers as to defendant's intoxication. Here the trial court found that prior to the collision defendant had been driving at "an unreasonable" rate of speed, that he drove through a marked stop sign without stopping or slowing down, and that he had been intoxicated. Those findings are entitled to great deference by a court of review. (*People v. Jones* (1981), 98 Ill. App. 3d 489, 492-93, 424 N.E.2d 683.) The record supports the trial court's finding that the May 3, 1980, collision was caused by the defendant's reckless acts. Once again, it saw the witnesses testify and judged

their credibility and we see nothing in the record to upset its ruling. *People v. Powell* (1978), 72 Ill. 2d 50, 65, 377 N.E.2d 803, *cert. denied* (1979), 440 U.S. 907, 59 L. Ed. 2d 455, 99 S. Ct. 1215.

Affirmed.

VAN DEUSEN, J., concurs.

JUSTICE LINDBERG, dissenting:

My admiration for the majority's exposition of the common law applicable to this case is exceeded only by my astonishment at their refusal to apply it. In affirming the conviction in this case, the majority acquiesces in the trial court's express application of a standard derived from a totally irrelevant public health statute.

Illinois law dictates the application of the principles of the common law in this case. The use of those principles is consistent with the policies underlying the Criminal Code of 1961 as well as the analytical approach to this question taken in *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.

The commentators to the Criminal Code of 1961 noted that:

"[T]he supersession of all common-law definitions of particular offenses does not mean that the large mass of interpretive rules developed under the common law is superseded: these rules are a highly valuable part of our criminal law, and their effective replacement by statutory law would be exceedingly difficult." Ill. Ann. Stat., ch. 38, par. 1–3, Committee Comments, at 13 (Smith-Hurd 1972).

Likewise, in *People v. Greer*, our supreme court ultimately relied upon common law principles to determine whether an unborn fetus could be an "individual" for the purposes of a homicide prosecution, thus rejecting the State's invitation to "create a new offense" by judicial fiat. Although as the majority comments, the facts in *Greer* are distinguishable, the reasoning of the supreme court in applying the common law is sound and persuasive in this case. I would adhere to the common law definition of live birth as it pertains to the offense of reckless homicide. Under that definition, the proof offered by the State of a few transitory heartbeats is insufficient to establish live birth and thus, is insufficient to sustain the conviction.

The great weight of the common law requires that in order to establish a live birth for the purposes of a criminal prosecution, it must be shown that the newborn be completely delivered and have established an existence which is separate and independent from that of

the mother. Generally, it has been held that such an independent existence is shown beyond a reasonable doubt where an infant survives long enough to take a breath. *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203; *Morgan v. State* (1923), 148 Tenn. 417, 256 S.W. 433.

Far from conclusively establishing independent existence, the heartbeat exhibited by Misty Oswald is utterly consistent with the dependant existence of a fetus in the womb. It is well known that a fetus exhibits regular heart action in the very early stages of pregnancy. (Gray, Anatomy of the Human Body 28, 536 (29th Am. ed. 1973).) The heart action testified to by the medical experts in this case is readily ascribable to the residuum of the mother's support. The heartbeat standing alone seems to provide no particular indicia of nonfetal life and nonfetal life is an indispensable element of the corpus delicti in this case. Conversely, breathing is an action completely inconsistent with and unnecessary for fetal life.

> "Although slight but regular instinctive movements of the thoracic walls, are stated to occur in the enwombed foetus, breathing as a function is quite novel. It is called for by the actual or functional detachment of the after-birth from the womb *** 'Le besoin de respirer' [the need to breathe] evokes the first breath of life.. Reflex or automatic attempts *** are initiated under this 'stimulus of necessity.' " Atkinson, *Life, Birth & Live-Birth*, 20 L.Q. Rev. 134, 153 (1904).

Testimony adduced at trial confirms that respiration is necessary to support an independent existence. The record also reveals that although oxygen was administered and resuscitation attempted, these measures were to no avail. No discernible inflation of the lungs was noted and muscle tone was lacking. The only evidence before the court indicated that, at birth, the infant exhibited a heart rate of 50, a rate well below that normally found in newborns. In the absence of *any* other indicia of independent existence I am constrained to conclude that these few heartbeats are insufficient evidence by which to establish beyond a reasonable doubt that Misty Oswald was born alive.

While apparently acknowledging the applicability of the common law to this case, the majority endorses the trial court's express reliance on a completely different standard. This standard was derived from a civil provision, with no regard either for the purpose of that provision or for the context into which it was being interposed. The Vital Records Act is clearly a civil enactment. Nothing on the face of the statute indicates that it was intended for use as a criminal standard. No court in Illinois has ever before suggested such an applica-

tion. *E.g., People ex rel Gage v. Siman* (1917), 278 Ill. 256, 115 N.E. 817.

The majority comments that a trial court acting as finder of fact may weigh the evidence before it and that unless the resulting judgment rests on doubtful, improbable, unsatisfactory, or clearly insufficient evidence, that judgment should be affirmed. The majority notes that the trial court's finding in this case is consistent with the testimony presented by the medical experts. However, the opinions relied upon by the trial court centered for the most part on whether the infant had been born alive for purposes of certification under the Vital Records Act.

In stressing the trial court's ability to weigh the evidence, the majority seems to have overlooked the dual role occupied by a judge during a bench trial. In such a situation, the trial judge is the tribunal compelled to determine what the facts are and he is also the magistrate required to lay down correctly the guiding principle of law. See *Palmer House Co. v. Otto* (1952), 347 Ill. App. 198, 106 N.E.2d 753.

Once the supreme court has declared the law on a subject, it alone can overrule or modify that rule. (*Rusher v. Smith* (1979), 70 Ill. App. 3d 889, 388 N.E.2d 906.) Our institutional function as an intermediate appellate court is to follow the decisions of our supreme court, and to decide such cases in conformity with logical extensions of those rulings. *People v. O'Neal* (1976), 40 Ill. App. 3d 448, 352 N.E.2d 282, *cert. denied* (1977), 431 U.S. 969, 53 L. Ed. 2d 1065, 97 S. Ct. 2929; *Doxtater v. State Farm Mutual Automobile Insurance Co.* (1972), 8 Ill. App. 3d 547, 290 N.E.2d 284.

In my opinion the supreme court has ruled that the common law standard should be determinative in cases of this type. The trial court erred in its application of the Vital Records Act to this case, and the decision of the majority compounds that error.