BENJAMIN, J.,
concurring: ■
Words are inadequate for the tragedy occasioned by Ms. Louk’s injection of meth-amphétamine into her body in her thirty- *210 seventh week of pregnancy. Because of her actions, an innocent child is dead. While I have dedicated much of my service in the judiciary to helping individuals take responsibility for their decisions, overcome their addictions and turn their lives around, I cannot personally excuse the decision taken here by Ms. Louk—a decision which not only harmed herself, but which also resulted in the senseless end of the life of another. However addiction may explain irresponsible behavior, it does not excuse it. What Ms. Louk did was wrong. If I were to step away from my duty to follow the law, and to instead make it, I might be tempted, as others, to affirm this conviction.
The law is inadequate to address this tragedy. However much I might believe that Ms. Louk was wrong, the decision of whether actions such as hers are criminal is that of the West Virginia Legislature. That is the essence of a government and a judicial system based upon the constitution, the rule of law, and .the fundamental precept that the policy of this state is the prerogative of the political branches of government—not a handful of judges making decisions behind closed doors. Our Legislature has chosen not to criminalize behavior such as Ms. Louk’s. No amount of wishful thinking or artful reading of our law permits another conclusion. The unambiguous laws at issue, West Virginia Code § 61-8D-4a (1997) and West Virginia Code § 61-8D-1 (2005),[1] are as plain as they are specific—they do not provide for the criminal prosecution undertaken herein of Stephanie Louk under these facts. And while, out of a desire to assuage a personal sense of outrage, it may be tempting for a judge to here engage in activism under the guise of supposed statutory interpretation, it is "beyond this court’s legal and ■ constitutional province to make criminal that which the legislature has not.
Pursuant to West Virginia Code § 61-8D-4a, a parent is guilty of a felony if that parent “negleet[s] a child under his or her care, custody or cqntrol and by such neglect causes the death of said child.” As used in this section, “ ‘[cjhild’ means- any person under eighteen years of age not otherwise emancipated by law.” W. Va. Code § 61-8D-1. As reflected in the majority opinion, West Virginia Code § 61-8D-1 unambiguously refers to a child in being, not the unborn. Had the Legislature intended “child” to include the unborn, it would have expressly said so, which it has done elsewhere in the Code.
Contorting West Virginia Code § 61-8D-1 to include the unborn within the definition of a “child” creates irreconcilable conflicts between the provisions of article 8D, chapter 61 and other próvisions in the Code. For example, under West Virginia Code § 61-8D-2a, it is a crime for a parent to knowingly allow another person to inflict.upon their child any impairment of physical condition that results in death to the child. If “child” includes the unborn, West Virginia Code § 61-8D-2a would criminalize behavior explicitly excluded as criminal behavior elsewhere in the Code. See W. Va. Code § 61-2-30(d)(l) (2005) (excluding the acts of a pregnant woman with respect to the embryo or fetus from giving rise to prosecution under the Unborn Victims of. Violence Act); W. Va. Code § 16-2M-6 (2015) (providing that “[n]o penalty may be assessed against any patient upon whom an abortion is performed or induced”). It is ilr logical to assume that the same legislature which immunized- a woman from prosecution for receiving an illegal abortion, such as a late term abortion, nevertheless intended to permit the prosecution of a woman for taking' drugs during pregnancy that ultimately resulted in the death of her fetus or subsequently born child.
A similar absurdity arises when forcing the nearly identical definitions of “child” in other sections of the Code to include the unborn. For instance, in the article addressing grandparent visitation, West Virginia Code § 48-10-202 (2001) defines “child” as “a person under the age, of eighteen years who has not been married or otherwise emancipated.” This definition is almost a mirror image of the definition of “child” provided in West Virginia Code § 61-8D-1. If the Legislature *211 had intended that “child” include the unborn in West Virginia Code § 61-8D-1, then, the substantively identical language in West Virginia Code § 48-10-202 must also include the unborn. It would necessarily follow, then, that grandparents could file a motion or petition for visitation, with a fetus., See W. Va. Code § 48-10-301 (“A grandparent of a child residing in this State may, by motion or petition, make application to the circuit court or family court of the county in which that child resides for an order granting visitation with his or her grandchild.”). Likewise, fetuses could be subject to custody determinations under the Uniform Child Custody Jurisdiction and Enforcement Act (“UCCJEA”), W. Va. Code § 48-20-101 to -404. See W. Va. Code § 48-20-102 (2001) (defining “child” as “an individual who has not attained eighteen years of age”). Unmistakably, straining the grandparent visitation statutes and the UC-CJEA to apply to the unborn defies common sense, just as it does in West Virginia Code § 61-8D-4a.
Though perhaps emotionally tempting, stretching West Virginia Code § 61-8D-4a to permit this criminal prosecution to stand, ie., the prosecution of a woman for acts committed during pregnancy'that contribute to the death of a subsequently born child, renders the statute hopelessly vague. What' conduct would constitute unlawful neglect? Would the failure to seek prenatal care constitute neglect if the subsequently bom child dies? Could eating raw oysters during pregnancy, which is commonly known to carry a risk of food poisoning, be considered neglect? At what stage in the pregnancy would any such acts be neglectful? Would all the mothers of newborn children that die be the potential subject of investigations to determine if any of their activities while pregnant contributed to the death of their children?[2]
My personal outrage at Ms. Louk’s actions is admittedly driven by frustration. No matter how much I may wish to simply judge under the law, I cannot ignore or forget'the victim here. This child should today be playing,- laughing and engaging in the things children do. This child was a victim. If there is a victim, one might expect that there should be a crime. But, no matter how much others may argue to the contrary, here the legislature has decided otherwise.
I recognize that the Legislature was faced with many considerations in making the public policy as it relates to the facts of this case. My personal concerns, which are based upon the facts of this ease, are in no way meant to minimize or disregard such other considerations. Aside from the statutory conflict and vagueness that would result from the State’s position, there are overriding health and safety concerns which the legislature could look to in justifying the immunization of pregnant women from prosecution for things they may do to themselves—such as ingesting harmful substances—that may harm fetuses they carry. Chief among these is the concern that pregnant women may not seek health care that might be of great benefit to them and their unborn children for fear of criminal prosecution,[3]
*212 Regardless of any feelings we may have regarding what the law should he, the Legislature announces what the law is, and it has defined “child” in West Virginia Code § 61-8D-1 to exclude the unborn. Were this Court to itself legislate West Virginia Code § 61-8D-4a to include the unborn, which would brush aside succinctly stated statutory language, this Court would engage in the worst kind of result-oriented judicial activism.
As a judge following the rule of law, this must be my decision. But let me be clear: While the legislature has chosen not to criminalize the type of behavior in which Ms. Louk engaged, she factually was responsible for the death of her child. I pray that she recovers from her addiction.
Davis, Justice,
concurring:
(Filed June 3, 2016)
An old adage counsels, “hard cases make bad law.” Truer words could not be spoken of the case sub judice. Despite our different views as to the appropriate decision herein, all members of the Court agree that what has occurred in this case is nothing short of ah unspeakable tragedy-a tragedy for the young victim who did not live to see her childhood and a tragedy for the child’s mother who was gripped by the throes of addiction and is now, through her own actions, forever without her child. While the facts of this case are difficult, the law governing these proceedings is not. This is so because the Legislature clearly has defined those behaviors that are punishable as criminal acts and those that are not. Because the majority of the Court properly accepted the Legislature’s plain arid unambiguous language and correctly applied that law to reach its decision of this case, I concur in the majority’s opinion.
Through this concurrence, I do not wish to rehash that which my brethren so astutely and eloquently have stated. In rendering the majority’s decision, Chief Justice Ketchum conducts a thorough statutory analysis, applying the plain meaning of the words employed by the Legislature in enacting W. Va. Code §: 61-8D-4a (1997) (Repl: Vol. 2014) and reconciling that provision with other, similar statutes to ascertain the precise meaning of the word “child” intended by the Legislature. Moreover, to the extent that this case presented a tempting opportunity for this Court to adopt its own policy preferences over those expressly chosen by the Legislature, the majority has demonstrated admirable, and appropriate, restraint insofar as
[tjhis Court does not sit as a superlegis-lature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature • to consider facts, establish policy, and embody that policy, in, legislation. It is the .duty of this Court to enforce legislation unless it runs afoul of the State or Federal Constitutions.
Syl. pt. 2, Huffman v. Goals Coal Co., 223 W. Va. 724, 679 S.E.2d 323 (2009).
I do, however, wish to take this opportunity to correct numerous inaccuracies and inconsistencies contained in the separate opinion of my dissenting colleagues for fear that their rhetoric may provide the basis for a misguided analysis should this issue be revisited by. this Court or the Legislature. In an opinion that purports “to apply the law in accordance with our established principles of jurisprudence,” this touted refrain becomes just that as the resulting diatribe, instead, contorts and confounds the law with a disjointed statutory analysis that confuses, rather than clarifies, the governing legal principles.

Statutes Relating to the Same Subject Must Be Read In Pari Materia

We long have held that statutes pertaining to the same subject matter must be read in pari materia:
*213 Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in pari materia to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly.
Syl. pt. 5, Fruehauf Corp. v. Huntington Moving & Storage Co., 159 W. Va. 14, 217 S.E.2d 907 (1975). Stated otherwise, it is proper to look to corresponding statutes to provide guidance in interpreting and applying a controverted statute. See Syl. pt. 3, Smith v. State Workmen’s Comp. Comm’r, 159 W. Va. 108, 219 S.E.2d 361 (1975) (“Statutes which relate to -the same subject matter should be read and applied together so that the Legislature’s intention can be gathered from the whole of the enactments.”). Here, the majority properly considered and compared the language of W. Va. Code § 61-8D-4a and W. Va. Code § 61-2-30 (2005) (Repl. Vol. 2014) in ascertaining the Legislature’s intent in promulgating these provisions and determining that
[t]he Legislature did not make any reference to an “unborn child” or “fetus” in W. Va. Code § 61-8D-4a [1997]. The statute only refers to a parent neglecting “a child” under his or her care, custody or control. Therefore, W. Va. Code § 61-8D-4a, our child neglect resulting in death statute, does not encompass prenatal acts that result in harm to a subsequently born child.
Maj. op. at Syl. pt. 2.
By contrast, the dissenters, while recognizing the existence of these two, distinct statutes, simply ignore the statutory construction canon of in pari materia and fail to reconcile the two provisions to achieve a harmonious, rather than discordant, interpretation. Instead, the construction proposed by the dissenting opinion will produce incongruous results: under the facts of the case sub judice, Ms. Louk could be prosecuted under W. Va. Code § 61-8D-4a but her same conduct would be exonerated by W. Va. Code § 61-2-30(d)(5). That W. Va. Code § 61-8D-4a pertains solely to neglect resulting in a child’s death whereas W. Va. Code § 61-2-30 contemplates more heinous offenses is of no moment insofar as the victim’s ultimate fate, under both statutes and the facts at issue herein, is her untimely death. In fact, this similarity between the two statutes is further evidence that the provisions should be construed consistently with one another or in pari materia insofar as the Legislature is presumed to know of its prior statutes and to intend statutory enactments to form one unified body of law.
A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it was intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the sub-jeet matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.
Syl. pt. 5, State v. Snyder, 64 W. Va. 659, 63 S.E. 385 (1908). See also Martin v. Randolph Cnty. Bd. of Educ., 195 W. Va. 297, 312, 465 S.E.2d 399, 414 (1995) (“ ‘[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.’ ” (quoting Connecticut Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149, 117 L.Ed.2d 391 (1992))).[1] Nevertheless, the dissenters inexplicably ignore *214 this canon of statutory construction, yielding more confusion than clarification of the applicable law.

Avoidance of Unjust or Absurd Results

Similarly, the statutory construction canons direct reviewing courts to avoid unjust or absurd results.
It is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is as well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity.
Syl. pt. 2, Click v. Click, 98 W. Va. 419, 127 S.E. 194 (1925). Accord State ex rel. Pinson v. Varney, 142 W. Va. 105, 109, 96 S.E.2d 72, 74 (1956) (“Where it is possible to do so, it is the duty of the courts, in the construction of statutes, to harmonize and reconcile laws, and to adopt that construction of a statutory provision which harmonizes and reconciles it with other statutory provisions.” (internal quotations and citation omitted)). As my concurring colleague, Justice Benjamin, has duly noted, however, the dissenters also have refused to heed this “established principle[ ] of jurisprudence” by embarking upon their own quest to ascertain the meaning of the word “child” as that term is used in W. Va. Code § 61-8D-4a.
In the case sub judice, the majority, faced with a statute that did not definitively answer the question as to whether the statutory reference to “child” includes “unborn children,” correctly compared the subject definition with the Legislature’s definitions of the term in other, corresponding statutes. Upon concluding its inquiry, the majority then determined that, the. term “child,” as used in W. Va. Code § 61-8D-4a, pertains solely to children in being and does not include those yet to be born. By contrast, the dissent’s strained interpretation of this tern produces inconsistent and absurd results when it is logically extended to other statutory provisions employing the term “child.” See, e.g., W. Va. Code § 17C-15-46 (2005) (Repl. Vol. 2013) (requiring “[ejvery driver who transports a child under the age of eight years in a passenger automobile ... shall ... provide for the protection of the child by properly placing, maintaining and securing the child in a child passenger safety device system ,” (emphasis added)); W. Va. Code § 49-7-101 (2015) (Repl, Vol. 2015) (adopting “Interstate Compact on the Placement of Children”; delineating procedure for child placements between states; and defining “child” as “a person who, by reason of minority is legally subject to parental, guardianship or similar control”). Again, the dissenters’ failure to follow the established canons of statutory construction results in disparate results that certainly wex-e not contemplated, or intended, by the Legislature in enacting the subject statute.

Legislators, Not Justices, Make Public Policy Determinations

Furthermore, despite repeated admonitions to follow the law and to leave policy decisions to the Legislature, the dissenting opinion nevertheless ignores the plain statutory language and substitutes its own policy preferences for those of Législature. It is well-established that a statute’s plain language should not be construed but should be applied as it is written. See Syl. pt. 4, West Virginia Health Care Cost Review Auth. v. Boone Mem’l Hosp., 196 W. Va. 326, 472 S.E.2d 411 (1996) (“If the language of an enactment is clear and within the constitutional authority of the law-making body which passed it, courts must read the relevant law according to its unvarnished meaning, without any judicial embroidery.”). Likewise, it is accepted that matters relating to the establishment or soundness of public policy are left to the wisdom of the Legislature and are not within the purview of this Court, See Syl. pt. 1, in part, State ex rel. Appalachian Power Co. v. Gainer, 149 W. Va. 740, 143 S.E.2d 351 (1965) (“Courts are not concerned with questions relating to legislative policy.”); Syl. pt. 1, State Road Comm’n of West Virginia v. County Court of Kanawha Cnty., 112 W. Va. 98, 163 S.E. 815 (1932) (“Courts are not concerned with questions relating to the policy of a legislative enactment. These questions are solely for the legislature.”); Syl. pt, 3, George v. Board of *215 Ballot Comm’rs, 79 W. Va. 213, 90 S.E. 550 (1916) (“The policy of a statute is legislative, not judicial, and it is the exclusive province of the legislature to declare the scope and extent thereof by its prescription of measures of enforcement and otherwise.”).
Despite its protestations to the contrary, it is clear that the result proposed by the dissenters’ opinion is based solely upon their preferred policy pronouncements 'as their failure to abide by established canons of statutory construction cannot otherwise be explained. Although they proclaim that, “[rjegardless of any feelings we may have regarding what the law should be, the Legis-latui’e announces what the law is,” my dissenting brethren nevertheless profess that the statute under scrutiny, W. Va. Code § 61-8D-4a, should apply to criminalize Ms. Louk’s actions. This suggested interpretation is directly contrary to the statute’s plain language; cannot be reconciled with the Legislature’s other, corresponding statutes; and does not comport with the Legislature’s unmistakable intent in enacting such legislation. Again, the dissenters preach one set of rules, but practice another.

Inappropriate Reliance on Inapposite Authority

Aside from the failure to acknowledge and apply the prevailing canons of statutory construction, I would be remiss if I did not also note that the cases relied upon by my dissenting brethren as suggesting that other courts would apply the bom alive rule to hold a mother criminally liable for her child’s in útero injuries caused by the mother’s actions do not have the same fact pattern as the case sub judice. That is, all of the extra-jurisdictional authority cited for this proposition involves harm to the unborn child that was inflicted by a person other than the child’s mother. See Ranger v. Georgia, 249 Ga. 315, 290 S.E.2d 63 (Ct. App. 1982) (unborn child bom prematurely after pregnant mother’s boyfriend shot her in the head; child died shortly after birth); Illinois v. Bolar, 109 Ill. App. 3d 384, 64 Ill. Dec. 919, 440 N.E.2d 639 (1982) (unborn child injured when intoxicated driver hit ear in which pregnant mother and unborn child were passengers; child died shortly after birth); Jones v. Kentucky, 830 S.W.2d 877 (Ky. 1992) (unborn child injured when intoxicated- driver hit car in which pregnant mother and unborn child were passengers; child died shortly after birth); Williams v. Maryland, 316 Md. 677, 561 A.2d 216 (1989) (unborn child injured when pregnant mother was fatally shot by arrow as pedestrian bystander caught in crossfire between defendant and another man; child died shortly - after birth); New Jersey v. Anderson, 135 N.J. Super. 423, 343 A.2d 505 (1975) (unborn twins born prematurely after pregnant mother was fatally shot; both children died shortly after birth); New York v. Hall, 557 N.Y.S.2d 879, 158 A.D.2d 69 (1990) (unborn child injured when pregnant mother was shot in the abdomen as a passerby caught -in crossfire between defendant and another man; child died shortly after birth); Cuellar v. Texas, 957 S.W.2d 134 (Tex.Ct.App.1997) (unborn child injured when intoxicated driver hit car in which pregnant mother and unborn child were passengers; child died shortly after birth). While the majority opinion .also relied on cases from our sister jurisdictions to support its ultimate decision, those cases, unlike the ones cited. by the dissenters, are based upon rulings rendered under fact patterns similar to the one presently before the Court and that are instructive to the Court’s analysis. Thus, rather than providing solid authority to support its position, the foundation upon which the dissenting opinion seeks to base its inapposite view .necessarily crumbles.
In their attempt to suggest shortcomings with the majority’s analysis, the dissenters, instead, eschew well-established principles of statutory construction in favor of a hodge podge approach that selects those ■ canons supportive of their position while ignoring the rest. Because the majority’s opinion herein is well-reasoned, legally sound, and reaches the correct result under the governing statutes, I concur in the majority’s decision in this case.

. This statute was amended in 2014, but the changes did not affect the definition of “child” as it appeared in the 2005 version of the statute.

. A study examining pregnant women between 2008 and 2011 revealed that more than 1 in four pregnant women in West Virginia smoked during their pregnancies. David Boucher, Many Pregnant Women in WV Smoke, Health Data Shows, Charleston Gazette-Mail, September 16, 2014, http://www.wvgazettemail.com/article/20140916/ DM01/140919386/1420. Data collected by the U.S. Centers for Disease Control and Prevention showed that in 2011, 29% of pregnant women in West Virginia smoked during their pregnancies. Id. West Virginia had the highest rate of pregnant smokers in the nation between 2008 and 2011. Id.

. Two years ago, the Tennessee Legislature en- , acted a "fetal assault” statute that permits the prosecution of a woman who gives birth to a child that is addicted to narcotics or harmed as a result of the woman's illegal narcotic use during pregnancy. Tenn. Code Ann. §.39-13-107 (2014). The statute excludes from punishment women who are "actively enrolled in an addiction recovery program” before delivery as long ■ as they successfully complete the program after delivery. Id. The statute includes a sunset clause whereby it is set to expire on July 1, 2016. Id.
The penalty provided in the .Tennessee law was intended to act as an incentive for dnig-addicted pregnant women to either avoid illegal drug use or to enroll in a drug treatment program before delivery. Sheila Burke, Doctors Applaud End of Tennessee's Fetal Assault Law, Associated Press, April 1-, 2016, http:llbigstory.ap.org/article/08ce 8448799148bf852babadc33dlaef/doctors-applaud-end-tennessees-fetal-assault-law. According to Tennessee doctors, however, fear of prosecution drove some pregnant women using illegal drugs *212 "to avoid prenatal care[,] ... exposing their babies to more risks while failing to reduce the astronomical costs of treating newborns who suffer from drug withdrawal." Id. Furthermore, since the fetal assault law was enacted, there has been no decrease in the number of afflicted children born. Id. With no observable decrease in children born to drug-addicted mothers and with reports of pregnant women avoiding seeking health care for fear of criminal prosecution, Tennessee legislators voted not to extend the law passed its expiration date. Id.

. It also should be noted that where two statutory provisions simply cannot be reconciled, the statute last enacted is controlling. See State ex rel. Pinson v. Varney, 142 W. Va. 105, 109, 96 S.E.2d 72, 74 (1956) (“If the several statutory provisions cannot be harmonized, controlling effect must be given to the last enactment of the Legislature."). Although the plain language of W. Va. Code § 61-8D-4a (1997) (Repl. Vol. 2014) answers the interpretative question presented by the case sub judice, if the Court had determined that W. Va. Code § 61-8D-4a and W. Va. Code § 61-2-30 (2005) (Repl. Vol. 2014) could not be reconciled, the latter statute, which exempts a mother from criminal liability for her actions that cause harm to her unborn child, would be controlling, which result is consistent with that obtained by the majority's opinion herein.