The State v. Winthrop. ·

1. **Criminal Law:** INDEPENDENT LIFE: MURDER. Independent life cannot properly be said to exist in an infant prior to the establishment of independent circulation. An infant is not the subject of murder until an independent circulation has been established. Prior to that time the life of the child, even after it is born, is substantially *foetal* life, which the law distinguishes from independent life.

*Appeal from Floyd District Court.*

WEDNESDAY, JUNE 14.

THE defendant was convicted and sentenced for manslaughter, and now appeals to this court.

*J. Evans Owens*, for appellant.

*M. E. Cutts, Attorney-General*, for appellee.

ADAMS, J.—The defendant is a physician, and was employed by one Roxia Clayton to attend her in childbirth. The child died. The defendant is charged with having produced its death. Evidence was introduced by the State tending to show that the child, previous to its death, respired and had an independent circulation. Evidence was introduced by the defendant tending to disprove such facts.

The defendant asked the court to give the following instruction:

· "To constitute a human being, in the view of the law, the child mentioned in the indictment must have been fully born, and born alive, having an independent circulation and existence separate from the mother, but it is immaterial whether the umbilical cord which connects it with its mother be severed or not."

The court refused to give this instruction, and gave the following:

"If the child is fully delivered from the body of the mother, while the after birth is not, and the two are connected by the umbilical cord, and the child has independent life, *no matter whether it has breathed or not, or an independent circulation has been established or not*, it is a human being, on which the crime of murder may be perpetrated."

The giving of this instruction, and the refusal to instruct as asked, are assigned as error.

The court below seems to have assumed that a child may have independent life, without respiration and independent circulation. The idea of the court seems to have been that the life which the child lives between the time of its birth and the time of the establishment of respiration and independent circulation is an independent life. Yet the position taken by the Attorney-General, in his argument in behalf of the State, is fundamentally different. He says: "It will probably not be contended that independent life can exist without independent circulation, and hence the existence of the former necessarily presumes the existence of the latter, and so other or further proof is unnecessary." He further says: "The instruction complained of amounts to nothing more than the statement that, if the child had an independent life, then it was not necessary to establish those facts upon which the existence of life necessarily depends." If such was the meaning of the court below, the language used to express it was very unfortunate. The court said that, if the child had independent life, it is no matter whether an independent circulation had been established or not. The Attorney-General says that if the child had independent life, it had independent circulation, of course. But whether we take the one view or the

other, we think the instruction was wrong. We will consider first the view that independent life and independent circulation necessarily co-exist, and examine the instruction as if that were conceded.

It follows that where a child is born alive, and the umbilical cord is not severed, and independent circulation has not been established, independent life is impossible, and the instruction amounts to this, that if the jury should find independent life under such circumstances, although it would be impossible, they might find the killing of the child to be murder. Such an instruction could serve no valuable purpose, and would necessarily involve the jury in confusion. It would do worse than that; it would tell the jury in effect that they might find independence of life in utter disregard of the conditions in which alone it could exist. To show how the defendant was prejudiced, if the instruction is to be viewed in this light, we may say that there was evidence that the *ductus arteriosus* was not closed. This evidence tended to show, slightly at least, that independent circulation had not been established. The instruction told the jury, by implication, that they might disregard this evidence. But we feel compelled to say that we do not think that the Attorney-General's interpretation of the instruction ever occurred to the court below. It is plain to see that the court below meant that independent life is not conditioned upon independent circulation. The error, if there was one, consisted in assuming that it was not. The question presented for our determination is by no means free from difficulty. Can the child have an independent life, while its circulation is still dependent upon the mother? There are two senses in which the word independence may be used. There is actual independence, and there is potential independence. A child is actually independent of its father when it is earning its own living; it is potentially independent when it is capable of earning its own living. We think the court below used the word *independent* in the latter sense. While the blood of the child circulates through the *placenta*, it is renovated through the lungs of the mother. In such sense it breathes through

1. CRIMINAL law: actual and potential life: murder.

the lungs of the mother. Wharton & Stille's Medical Juris-prudence, 2 Vol., Sec. 128. It has no occasion during that period to breath through its own lungs. But when the re-source of its mother's lungs is denied it, then arises the exi-gency of establishing independent respiration and independent circulation. Children, it seems, oftentimes do not breath im-mediately upon being born, but if the umbilical cord is sev-ered, they must then breathe or die. Cases are recorded, it is true, where a child has been wholly severed from the mother, and respiration has not apparently been established until after the lapse of several minutes of time. During that time it must have had circulation, and the circulation was inde-pendent. Whether it had inappreciable respiration, or was in the condition of a person holding his breath, is a question not necessary to be considered for the determination of this case. It is sufficient to say, that while the circulation of the child is still dependent, its connection with the mother may be suddenly severed by artificial means, and the child not neces-sarily die. This is proven by what is called the Cæsarean operation. A live child is cut out of a dead mother and sur-vives. Such a child has a potential independence antecedent to its actual independence. So a child which has been born, but has not breathed, and is connected with the mother by the umbilical cord, may have the power to establish a new life upon its own resources antecedent to its exercise. Ac-cording to the opinion of the court below, the killing of the child at that time may be murder. It is true that after a child is born it can no longer be called a *fœtus*, according to the ordinary meaning of that word. Beck says, however, in his Medical Juris., 1 Vol., 498: "It must be evident that when a child is born alive, but has not yet respired, its condi-tion is precisely like that of the *fœtus in utero*. It lives merely because the *fœtal* circulation is still going on. In this case none of the organs undergo any change." Casper says, in his Forensic Medicine, 3 Vol., 33: "In *foro* the term 'life' must be regarded as perfectly synonymous with 'respiration.' Life means respiration. Not to have breathed is not to have lived."

While, as we have seen, life has been maintained independent of the mother without appreciable respiration, the quotations above made indicate how radical the difference is regarded between *fœtal* life and the new life which succeeds upon the establishment of respiration and independent circulation.

If we turn from the treatises on Medical Jurisprudence to the reported decisions, we find this difference, which is so emphasized in the former, made in the latter the practical test for determining when a child becomes a human being in such a sense as to become the subject of homicide. In *Rex v. Enoch*, 5 C. & P., 539, Mr. Justice J. PARKE said: "The child might have breathed before it was born, but its having breathed is not sufficiently life to make the killing of the child murder. There must have been an independent circulation in the child, or the child cannot be considered as alive for this purpose."

In *Regina v. Trilloe*, 1 Carrington & Marshman, 650, ERSKINE, J., in charging the jury, said: "If you are satisfied that this child had been wholly produced from the body of the prisoner alive, and that the prisoner wilfully and of malice aforethought strangled the child, after it had been so produced, and while it was alive, and while it had an independent circulation of·its own, I am of the opinion that the charge is made out against the prisoner." See also Greenleaf on Ev., 3 Vol., Sec. 136.

It may be asked why, if there is a possibility of independent life, the killing of such a child might not be murder.

The answer is, that there is no way of proving that such possibility existed if actual independence was never established. Any verdict based upon such finding would be the result of conjecture.

REVERSED.