In *Ranger v. State,* 249 Ga. 315 (290 SE2d 63) (1982), post, decided contemporaneously with the case before us, we hold that Code § 38-1801 (which is applicable to impeachment) is not applicable where a witness' prior contradictory statement is introduced as substantive evidence pursuant to *Gibbons v. State,* supra. I would apply the rationale of *Ranger* here. I therefore concur in the judgment.

## 38165. RANGER v. THE STATE.

HILL, Presiding Justice.

Victor Ranger was indicted for the malice murder of his pregnant girl friend, Helena Carter, and the felony murder of her child who was prematurely born after she was shot. He appeals from his convictions and sentences to life in prison imposed on September 2, 1981, following a jury trial.

The defendant's father testified that when he arrived home on December 8, 1980, at approximately 6 p.m., the defendant and Helena Carter were talking in the living room of the Ranger home. Helena Carter was 15 years old and six to seven months pregnant. Although she had previously lived with the Rangers, she was not living there at this time. Prior to this day, the defendant apparently believed the child to be his.

About an hour after he arrived home, while watching television in the bedroom with his daughter Elaine, the defendant's father heard a shot. Upon running into the living room and seeing that Helena Carter had been shot in the head, Elaine asked the defendant if he shot her. He said no. The defendant, who was holding a gun, became hysterical and his father dragged him away and made him put the gun down. His father testified that when he entered the living room, his son said that he didn't know she was shot and that he "done messed up now." He also testified that his son had said that he "didn't mean to do it."

The defendant's sister Elaine testified that the victim and the defendant had been talking in the living room some 2-3 hours before the shooting and that the defendant had gotten the gun earlier in the afternoon. She also testified that she had spoken to her brother on the phone earlier that day and he had found some letters connecting the victim with someone called Mitchell. She was emphatic in her testimony that her brother had not said anything about hurting

Helena, but in her statement given to the police on the evening of the shooting she quoted her brother as having said that he didn't want to hurt Helena but if she lied to him he was going to hurt her.

Several people arrived at the house immediately after the shooting. Someone called the police, and the first officer arrived about 7:20 p.m. He called homicide and called for an ambulance. When it arrived, Helena Carter was taken to Grady Hospital. A homicide detective found one spent shell and five live shells in the gun.

When Helena Carter arrived at Grady she was treated by a neurosurgeon who testified that she was in a Grade 5 (terminal) coma. The neurosurgeon determined that Helena Carter was not likely to live more than a few hours. The cause of her subsequent death was a bullet through her brain, fired from a distance of 2 or 3 inches. Because an obstetrician detected a fetal heart beat, the baby was delivered by Caesarean section at about 8:30 p.m. Helena Carter died at 9 or 9:10 p.m. When the baby was born, he had spontaneous respiration, a heart rate, and was moving his extremities. However he was in respiratory distress (breathing with great difficulty), had poor color and tone and abnormal reflex irritability. The baby responded well when given oxygen, but the doctors soon determined that he suffered from hyaline membrane disease (immature lung development). The baby's respiratory distress increased overnight and he died after 8 a.m. the next morning. In the doctor's opinion, the baby was in his 25th to 27th week of gestation.

Firearms expert Kelly Fite testified that he examined the revolver which fired the fatal bullet and that it had to be cocked before the trigger, which required 3 1/2 pounds of force, would fire the weapon. On cross examination he testified that if the revolver did not have an empty chamber under the hammer and if it was dropped and fell on the hammer, it could discharge accidentally. The defense did not call any witnesses.

1. Code Ann. § 26-1101 (b) provides that "A person also commits the crime of murder when in the commission of a felony he causes the death of another human being, irrespective of malice." The defendant points out that Georgia does not have a feticide statute and he contends that his conviction for the felony murder of the infant cannot stand because at the time of the criminal act by the defendant the child was unborn and therefore not a "human being" within the meaning of Code Ann. § 26-1101 (b). See Committee Notes to Tentative Draft of the Proposed Criminal Code of Georgia, Code Ch. 26-12, Abortion, p. 68 (1966).

The repeal of our feticide statute (Code § 26-1102, Ga. L. 1968, p. 1432; repealed Ga. L. 1973, pp. 635, 638) is not material here. The

feticide statute would have applied to the death of the fetus.[1] Where the injured victim is born alive, the homicide statute applies. "Where a child born alive afterward dies by reason of bruises inflicted on it, before birth, by the beating of its mother, the offense is murder." 1 Warren on Homicide § 71 at p. 308 (1914); see 1 Wharton's Criminal Law, § 573 (1932); see also 40 AmJur2d Homicide § 9; Homicide-Unborn Child, 40 ALR3d 444.

" 'In order to convict for the murder of a newly born baby, it is incumbent upon the State to prove that the child was born alive and had an independent and separate existence from its mother, and that it was slain by the accused.' *Logue v. State,* 198 Ga. 672 (32 SE2d 397) (1944)." *Hall v. State,* 243 Ga. 207, 209 (253 SE2d 160) (1979). Contrary to the defendant's assertions, we find that these elements were satisfied in this case. The state introduced evidence that the child was born alive, had spontaneous respiration as well as a heart rate, and could move his extremities; that he survived some 12 hours after his delivery; and that his death was caused by hyaline membrane disease, caused by his premature delivery, which itself was caused by the shooting of his mother. This is sufficient to authorize a conviction for the felony murder of the infant. *Hall v. State,* supra; 1 Warren on Homicide § 71, supra; 1 Wharton's Criminal Law, § 573, supra; 40 AmJur2d Homicide § 9, supra; Homicide-Unborn Child, 40 ALR 3d 444, supra.

2. The defendant complains that the trial court erred in allowing the prosecutor over objection to impeach two of the state's witnesses, the defendant's father and sister, by use of their prior inconsistent statements. Both had given signed statements to the police on the night of the crime. The defendant contends that these statements were used by the prosecutor to impeach his own witnesses and to infer by innuendo that they were lying. We find that the defendant's father's testimony did not contradict his statement.

The defendant's sister's testimony is, however, another matter. In her statement, given shortly before 9 p.m. on December 8, 1980, she said, in part: "On December 8, 1980 a little after 7:00 p.m., me and my dad was sitting in my bedroom looking at TV, and we heard one gunshot. I got up and I went in there and Vic was holding her and I asked him what was wrong with her, Helena Carter. I had pulled him back sort of from her and I ran back to my room and called the ambulance, after I had saw the blood squirting from her head. My

---

[1] Feticide is the destruction of the life of a fetus. Anno. 40 ALR3d 444, fn. 3 at 446. The Committee to Revise the Georgia Criminal Law undoubtedly understood the correct meaning of feticide.

brother was hollering 'Lord, have mercy, I done messed up now. I shot her, but I didn't mean to do it.' Vic ran and got the towel and went and put it on her head. Vic had grabbed my father and I was taking her pulse to see if she was living, and he was saying 'O Lord, I done killed her.' ... Today my brother called me about 11:30 and told me that he had found some letters concerning Lynn [the victim] and Mitchell and the baby. He had read some of them to me. It said Lynn love Mitchell, always and forever. He read me this part saying 'If you want me back, write me, cause I still love you.' He found some notes saying where the boy was stationed at. He just kept on talking to me saying that he didn't want to hurt Lynn, but if she lie to him, he was going to hurt her."

When she testified, the defendant's sister denied having told the police that the defendant had said in their phone conversation that if the victim lied to him he would hurt her, and maintained that he had not said that. She also testified that when she said, "Victor you done shot that gun" he responded, "I ain't shoot her, I ain't shoot her." She later testified: "He said 'I didn't shoot her, I didn't shoot her and he said she grabbed the gun later on, said she grabbed the gun, I didn't mean to shoot her, I didn't mean to shoot her.' " After looking at her statement, she said that he had never said "I done killed her" and she didn't know how it got into the statement.

The defendant objected to the prosecutor's comparison of her testimony with her statement, arguing that the prosecutor was not entitled to impeach his own witness unless he could show surprise. Code § 38-1801 provides in pertinent part: "A party may not impeach a witness voluntarily called by him, except where he can show to the court that he has been entrapped by said witness by a previous contradictory statement. . . ."

In the recent case of *Gibbons v. State,* 248 Ga. 858, 862 (286 SE2d 717) (1982), we held that "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeachment purposes." That part of Code § 38-1801 quoted above is applicable to impeachment of witnesses by prior contradictory statements. Having held in *Gibbons* that a prior contradictory statement of a witness is admissible as substantive evidence, the quoted portion of Code § 38-1801 is inapplicable to a witness who takes the stand and is subject to cross-examination. Such witness must be given an opportunity to explain or deny the prior contradictory statement, *Gibbons,* supra, as the defendant's sister was here. We therefore find no error.

3. The defendant enumerates as error the trial court's overruling of his objection and motion for mistrial which were

occasioned by the following argument by the prosecutor: "The court is going to give you a whole lot of law, and I'm sure [defense counsel] is going to argue a whole lot of facts up here before you, but the defense has put forward no explanation of any accident." After the defendant's objection and motion were overruled, the prosecutor continued: "Again, ladies and gentlemen, there is no evidence before you in this case of any accident — . . . — of any voluntary manslaughter, involuntary manslaughter — ." The defendant again objected and moved for a mistrial. The trial court overruled the motion.

The defendant contends these comments violated his fifth amendment right not to incriminate himself, as well as his statutory right not to have any comment made on his failure to testify. Griffin v. California, 380 U. S. 609 (85 SC 1229, 14 LE2d 106) (1965); Code Ann. § 27-405, § 38-415. We do not agree. United States v. Rochan, 563 F2d 1246, 1249 (5th Cir. 1977), is directly in point. In Rochan, the Court applied a two prong test (563 F2d at 1249): "To reverse for improper comment by the prosecutor, we must find one of two things: that 'the prosecutor's manifest intention was to comment upon the accused's failure to testify' or that the remark was 'of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' [Citations omitted.]" The Court went on to explain the first prong, manifest intention to comment, as follows (563 F2d at 1249): "We cannot find that the prosecutor manifestly intended to comment on the defendants' failure to testify, if some other explanation for his remark is equally plausible." In discussing the second prong, effect on the jury, the Court noted that a prosecutor's comment on the uncontradicted state of the evidence would not necessarily be construed by the jury as a comment on the defendant's failure to testify (563 F2d at 1250). In Rochan, the prosecutor said: "Now ladies and gentlemen of the jury, what did we hear from the defense in this case? Well, we heard that Mr. Rochan was a model prisoner." The Court found no error under either prong, noting that the prosecutor had been describing the government's evidence and was shifting his focus to the evidence favorable to the defendant (no manifest intent to comment), and that the jury could reasonably have so construed the comment (no necessary effect on the jury). The Court noted that a closer question would have been presented if the prosecutor had used the words "the defendant" as opposed to the words "the defense."

Similarly, in the case before us, the prosecutor had been describing the state's evidence and was shifting the focus to the evidence favorable to the defense. He said: ". . . I'm sure [defense counsel] is going to argue a whole lot of facts up here before you, but

the defense has put forward no explanation of any accident." The prosecutor's comment related to the defense counsel's anticipated closing argument on accident; it referred to defense counsel by name and to "the defense," not to the defendant. We do not find that the prosecutor manifestly intended to comment on the defendant's failure to testify. Likewise we do not find that the jury would have necessarily thought it a comment on the defendant's silence. The prosecutor's comment went to the lack of evidence of accident, not the failure of the defendant to testify. Defendant's argument that since he was the only surviving eyewitness such evidence could only come in through his testimony does not require a different result. The defense raised the possibility that the revolver could discharge accidentally if it were dropped. The prosecutor was authorized to argue that there was no evidence that the gun was dropped. On the contrary, the evidence was that the victim was shot in the head from a distance of 2 or 3 inches and the defendant was holding the gun when his father entered the room. Thus we hold that the prosecutor's comment does not require reversal. United States v. Jennings, 527 F2d 862, 870-71 (5th Cir. 1976); see *Smith v. State,* 245 Ga. 205, 207 (264 SE2d 15) (1980).

4. Four of the defendant's enumerations of error relate to the court's charge. The defendant first complains that the trial court erred in refusing to charge on misdemeanor involuntary manslaughter upon request (Code § 26-1103(b)). The trial court charged on murder, voluntary manslaughter (Code § 26-1103 (a)), and accident. There is no evidence here that Helena Carter's death, or her child's, was caused by "commission of a lawful act in an unlawful manner. . . ." Code § 26-1103 (b). We find no error. *Raines v. State,* 247 Ga. 504 (3) (277 SE2d 47) (1981).

5. The defendant next complains that the trial court's charge was incorrect and burden-shifting when the court charged that a reasonable doubt "means a doubt for which a specific reason can be given." We do not agree with the defendant's contention that this charge is burden-shifting, nor with the defendant's contention that the inclusion of the word "specific" was reversible error. We note that the trial court charged at length on the defendant's presumption of innocence and the state's burden of proof beyond a reasonable doubt. The trial court also charged the jury that: "The burden rests upon the state in this case to prove the material allegations of the indictment to your satisfaction and beyond a reasonable doubt. This burden never shifts to the defendant." Thus the jury could not have understood the complained-of charge to place any burden on the defendant. See *Franklin v. State,* 245 Ga. 141 (8) (263 SE2d 666), cert. denied, 447 U. S. 930 (1980).

6. The defendant next complains that the trial court erred in charging: "[A] person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no crime scheme or undertaking or intention." The defendant contends that by the use of the words "satisfactorily appears" this charge was both confusing and burden-shifting. Having read the charge as a whole we find "the jury could only have understood, correctly, that [the defendant] could not be convicted if the state failed to prove criminal intent beyond a reasonable doubt." *Franklin v. State,* supra, 245 Ga. at 154.

7. The defendant's final enumeration of error in regard to the trial court's charge is that the trial court erred in its charge as to count two of the indictment, the felony murder of the infant. The trial court charged as follows: "The law defines an aggravated assault as an assault with intent to murder, to rape or to rob or with a deadly weapon. In this connection, I charge you that for a homicide to have been done in the perpetration of any of these particular felonies, that is — well, not any, I'll say in the perpetration of aggravated assault and murder, there must be *some connection* between that felony and that homicide. Homicide must be done in pursuance of an unlawful act and not collateral to it. A homicide is committed in the perpetration of a felony when it's committed by the accused while he is engaged in the performance of any act required for the full execution of said felony.

"Then, I charge you that if you find and believe beyond a reasonable doubt that the homicide alleged in count two of the indictment *was caused* by the defendant while he was in the commission of aggravated assault and murder, as I have given you in charge, you would be authorized to convict the defendant of murder as alleged in count two." (Emphasis supplied.)

The defendant contends that the language italicized above ("some connection" and "was caused") was error, arguing that there has to be more than "some connection" and that the jury was not given proper guidelines as to causation, i.e., told it must be direct and not indirect. As for the first objection, immediately after having said there had to be "some connection," the trial court explained what this meant. Considering the charge as a whole, we find no error. *State v. McNeill,* 234 Ga. 696, 697 (217 SE2d 281) (1975). Likewise we find no error in the charge relating to causation. *State v. Crane,* 247 Ga. 779 (279 SE2d 695) (1981), relied on by the defendant, is inapposite.

8. The defendant's remaining enumerations of error do not warrant discussion.

*Judgment affirmed. All the Justices concur, except Gregory, J., who concurs specially as to Division 2.*

DECIDED APRIL 6, 1982 —
REHEARING DENIED APRIL 28, 1982.

*Tommy Chason, Louise T. Hornsby,* for appellant.
*Torin D. Togut,* amicus curiae.
*Lewis R. Slaton, District Attorney, Margaret V. Lines, Assistant District Attorney, Michael J. Bowers, Attorney General, George M. Weaver, Assistant Attorney General,* for appellee.

GREGORY, Justice, concurring specially.

While I agree with the result reached in Division 2 of the opinion, I take this opportunity to explain why I feel our Division 3 in *Davis v. State,* 249 Ga. 309 (290 SE2d 273) (1982) better resolves the problem of dealing with Code Ann. § 38-1801.

The two cases are duplicative in that both allow prior inconsistent statements of one's own witness to come into evidence without a show of surprise. They are different in the methods they use to reach that result. This case avoids § 38-1801 because it allows the statement to be entered as substantive evidence, based on our decision in *Gibbons v. State,* 248 Ga. 858 (286 SE2d 717) (1982). Division 3 of *Davis,* supra, allows the statement to be entered as impeaching evidence by removing the requirement to show surprise before one may be considered entrapped by the statement. Of course, under both *Davis* and *Ranger,* the rule of *Gibbons* applies. The prior inconsistent statement is not subject to a hearsay objection and the jury may consider the statement for the truth of the matter asserted therein.

I disagree with the approach taken in Division 2 of this case because I feel the prior inconsistent statement is still impeaching evidence even though it is also now admissible as substantive evidence. Because it is still evidence which tends to directly "impeach a witness voluntarily called by [a party]" in spite of its additional value as substantive evidence, I feel that § 38-1801 still applies to one's own witness who takes the stand and is subject to cross-examination. Because this court has chosen to adopt both approaches, it is clear that one may now use a prior inconsistent statement of one's own witness both to impeach that witness and as substantive evidence without a show of surprise without running afoul of § 38-1801.

This is a good result because it allows us in this case to avoid the archaic notion that a party must vouch for the veracity of the witnesses he calls. By avoiding such archaic notions in the law of evidence, we improve our system of justice by giving jurors a better opportunity to have all the facts of a case properly presented to them

before they make their decision.

For these reasons, I specially concur in Division 2 of this opinion.