332 S.E.2d 807

**STATE ex rel. Jeff ATKINSON**

v.

**Hon. Ronald E. WILSON, Judge, et al.**

No. 16319.

Supreme Court of Appeals of
West Virginia.

Dec. 18, 1984.

Dissenting Opinions July 9, 1985.

Terrance L. Britt, Fitzsimmons & Parsons, Wheeling, for appellant.

S. Clark Woodroe, Asst. Atty. Gen., Charleston, for appellee.

American Civil Liberties Union Foundation, Reproductive Freedom, Project, New York City, West Va. Civil Liberties Union, Charleston, amicus curiae.

MILLER, Justice:

The relator, Jeff Atkinson, seeks to prohibit his murder trial in the Circuit Court of Hancock County on the ground that the court is without jurisdiction to try him. In support of his request for a writ of prohibition, he argues that neither our murder statute, W.Va.Code, 61–2–1, nor its attendant common law principles provide criminal

sanctions for the murder of an unborn child.

On September 23, 1981, Teri Lynn Gooch, who was approximately thirty-seven weeks pregnant, was robbed and killed in her home. According to the medical examiner, her unborn child, Mark Alan Gooch, died within minutes of her death. The relator has already been convicted of first degree murder for killing Teri Lynn Gooch. The underlying prosecution in this case is for the death of her unborn child.

The circuit court concluded that it had jurisdiction to try the relator. After acknowledging that at common law a person could not be prosecuted for the murder of an unborn child, the court reasoned that this common law rule should be modified in light of medical advances that enable a

doctor to render a reliable opinion on the viability of an unborn child. The circuit court placed considerable emphasis on *Baldwin v. Butcher*, 155 W.Va. 431, 184 S.E.2d 428 (1971), where we recognized that a tort action for wrongful death could be brought on behalf of a viable unborn child.[1]

Because this is a legal issue of first impression in this State, we granted the petition for a writ of prohibition and issued a rule to show cause.[2] We conclude that the circuit court was without jurisdiction.

All of the parties in this proceeding agree that at common law, the killing of a viable unborn child was not murder.[3] Furthermore, the parties also agree that our murder statute, W.Va.Code, 61-2-1,[4] is not specific on this point and that we must rely

---

1. The single Syllabus Point in *Baldwin* states: "Under the provisions of Sections 5 and 6, Article 7, Chapter 55, Code, 1931, as amended, the wrongful death statute of this State, an action may be maintained by the personal representative of a viable unborn child for the wrongful death of such child caused by injuries sustained by it while in the womb of its mother resulting from the negligence of the defendant and, upon sufficient proof, such damages as may be recoverable under the statute may be awarded in such action."

2. Our traditional test for prohibition is stated in *State ex rel. Arnold v. Egnor*, 166 W.Va. 411, 422, 275 S.E.2d 15, 22 (1981): "Our law is settled that a writ of prohibition will lie where the trial court does not have jurisdiction or, having jurisdiction, exceeds its legitimate powers. Syllabus Point 3, *State ex rel. McCartney v. Nuzum*, [161 W.Va. 740], 248 S.E.2d 318 (1978); *State ex rel. Scott v. Taylor*, 152 W.Va. 151, 160 S.E.2d 146 (1968)."

3. This English common law rule is summarized in 4 S. Stephen, Commentaries on the Laws of England 58 (1914):
   "[T]o kill a child in its mother's womb is not murder, for murder must be of some one in being.... If, however, the child is born alive, and dies by reason of injuries received in the womb, or in the act of birth, the person who deliberately inflicted those injuries may be guilty of murder." (Footnotes omitted).
   *See also* 4 W. Blackstone, Commentaries on the Laws of England *198; 3 E. Coke, Institutes *58; W. LaFave and A. Scott, Handbook on Criminal Law 530–32 (1972).
   The Supreme Court of California in *Keeler v. Superior Court*, 2 Cal.3d 619, 625–27, 470 P.2d 617, 620–21, 87 Cal.Rptr. 481, 484–85, 40

A.L.R.3d 420, 424–26 (1970) (In Bank), cited a number of English cases supporting the born-alive rule, among which were *Rex v. Brain* (1834) 6 Carr. & P. 349, 172 Eng.Rep. 1272, *Rex v. Sellis* (1836) 7 Carr. & P. 850, 173 Eng.Rep. 370, and *Rex v. Crutchley* (1836) 7 Carr. & P. 814, 173 Eng.Rep. 355, and referred to Atkinson, *Life, Birth and Live-birth*, 20 L.Q. Rev. 134 (1904), for additional English authorities.
   The vast majority of American courts have held, in accordance with the common law, that in the absence of legislation to the contrary, the killing of an unborn child cannot be the basis for a charge of murder. *Clarke v. State*, 117 Ala. 1, 23 So. 671 (1898); *Keeler v. Superior Court, supra; Ranger v. State*, 249 Ga. 315, 290 S.E.2d 63 (1982); *People v. Greer*, 79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203 (1980); *State v. Winthrop*, 43 Iowa 519 (1876); *Hollis v. Commonwealth*, 652 S.W.2d 61 (Ky.1983); *State v. Gyles*, 313 So.2d 799 (La.1975); *People v. Guthrie*, 97 Mich.App. 226, 293 N.W.2d 775 (1980); *State in the Interest of A.W.S.*, 182 N.J.Super. 278, 440 A.2d 1144 (1981); *State v. Willis*, 98 N.M. 771, 652 P.2d 1222 (1982); *People v. Hayner*, 300 N.Y. 171, 90 N.E.2d 23 (1949); *State v. Sogge*, 161 N.W. 1022 (N.D.1917); *State v. Dickinson*, 28 Ohio St.2d 65, 275 N.E.2d 599 (1971); *State v. Amaro*, 448 A.2d 1257 (R.I.1982); *Harris v. State*, 28 Tex.App. 308, 12 S.W. 1102 (1889); *State v. Larsen*, 578 P.2d 1280 (Utah 1978); *Bennett v. State*, 377 P.2d 634 (Wyo.1963); Annot., 40 A.L.R.3d 444 (1971).

4. The relevant portion of W.Va.Code, 61-2-1, is: "Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery or burglary, is murder of the first degree. All other murder is murder of the second degree."

on common law principles. We stated in Syllabus Point 5 of *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978), that our murder statute does not define the substantive elements of murder: "W.Va.Code, 61–2–1, was not designed primarily to define the substantive elements of the particular types of first degree murder, but rather was enacted to categorize the common law crimes of murder for the purpose of setting degrees of punishment." Similarly, in *State v. Starkey*, 161 W.Va. 517, 523, 244 S.E.2d 219, 223 (1978), we pointed out that: "It is clear that our murder statute is not designed to cover all the essential elements of murder." [5]

.The critical issue is whether we have the authority to alter the common law rule that an unborn child cannot be the victim of a murder. In *Spencer v. Whyte*, 167 W.Va. 772, 775, 280 S.E.2d 591, 593 (1981), we were asked to construe our probation statute so that a term of imprisonment could be given as a part of probation when the statute, W.Va.Code, 62–12–9, was silent on this subject. We declined to do so, stating:

"We have traditionally recognized that the legislature has the primary right to define crimes and their punishments subject only to certain constitutional limitations. *State ex rel. Cogar v. Kidd*, [160 W.Va. 371], 234 S.E.2d 899 (1977); *State ex rel. Heck's v. Gates*, 149 W.Va. 421, 141 S.E.2d 369 (1965); *State v. Painter*, 135 W.Va. 106, 63 S.E.2d 86 (1950).... It is because of the legislative primacy in this area that we consider the right to determine the conditions under which a sentence can be suspended and a person placed on probation to be a legislative prerogative. Probation is inextricably tied to the setting of punishment, which is the legislature's domain." (Citations omitted).

The Virginia Supreme Court has been even more explicit by stating in *Taylor v. Commonwealth*, 187 Va. 214, 220, 46 S.E.2d 384, 387 (1948): "The General Assembly alone has power to define crimes against this Commonwealth. This power cannot be delegated to the courts, or to individuals, or corporations." In W. LaFave & A. Scott, *supra*, at 57–69, the issue of whether or not courts can create new common law crimes is discussed at length. The authors indicate that the modern view is that there is diminished authority for such a position [6] and conclude:

"It was only natural that judges should create crimes from general principles in medieval England, because such legislature as there was sat only infrequently and legislation was scanty. Today in the United States, as in modern England, the various legislatures meet regularly. The principal original reason for common law crimes has therefore disappeared." W. LaFave & A. Scott, *supra*, at 68–69.

In *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979), we discussed at length our ability to alter common law principles in view of Section 13 of Article VIII of the West Virginia Constitution [7] and W.Va.Code, 2–1–1.[8] Af-

---

**5.** In several other cases where our criminal statutes do not define all the elements of the crime, we have applied the common law elements. *E.g., State v. Harless*, 168 W.Va. 707, 285 S.E.2d 461 (1981) (W.Va.Code, 61–2–12, on robbery); *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981) (W.Va.Code, 61–3–13, on larceny).

**6.** The United States Supreme Court has held that there are no federal common law crimes and unless Congress has enacted a statute declaring the conduct to be a crime, it cannot be federally prosecuted. *James v. United States*, 366 U.S. 213, 224–25, 81 S.Ct. 1052, 1058, 6 L.Ed.2d 246, 256–57 (1961) (Black, J., concurring and dissenting); *United States v. Eaton*, 144 U.S. 677, 687, 12 S.Ct. 764, 767, 36 L.Ed. 591, 594 (1892); *United States v. Hudson & Goodwin*,

11 U.S. (7 Cranch) 32, 33–34, 3 L.Ed. 259, 260 (1812). Furthermore, it would appear that the current English view is that the creation of new crimes lies with Parliament and not the courts. Smith, *Judicial Law Making in the Criminal Law*, 100 L.Q.Rev. 46 (1984).

**7.** Article VIII, Section 13 of the West Virginia Constitution provides: "Except as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the legislature."

**8.** W.Va.Code, 2–1–1, states:
"The common law of England, so far as it is not repugnant to the principles of the Consti-

ter a thorough review of similar enactments in other states, we concluded that:

"The historical purpose of such provisions was to declare what sources would initially constitute the organic law which would govern the body politic. We do not find any jurisdiction which adheres to the view that such provisions were adopted to freeze the common law for the courts as of the date the particular provision was enacted." 162 W.Va. at 874, 253 S.E.2d at 675.[9]

*Morningstar* dealt with defining a rule on product liability, which is in the area of tort law. Courts, in their common law capacity, have traditionally played a major role in evolving tort principles on a case-by-case basis. We recognized this fact in *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 350, 256 S.E.2d 879, 889 (1979), where we reexamined and altered our rule of contributory negligence, stating: "The issue falls within the field of tort law, which historically has not been a settled area of the law such as property or contracts, but has been subject to continual change by the courts and legislatures to meet the evolving needs of an increasingly mobile, industrialized and technological society." (Footnote omitted). *See also Sitzes v. Anchor Motor Freight, Inc.*, 169 W.Va. 698, 710–711, 289 S.E.2d 679, 687 (1982); *Hill v. Joseph T. Ryerson & Son, Inc.*, 165 W.Va. 22, 30–31, 268 S.E.2d 296, 303 (1980); W. Prosser, Law of Torts 19–21 (4th ed. 1971); Green, *The Thrust of Tort Law: (Part I) The Influence of Environment, (Part II) Judicial Law Making, (Part III) The Scientific Environment*, 64 W.Va.L.Rev. 1, 115 and 241 (1961–62).

■ Thus, there exists a distinction between a court's power to evolve common law principles in areas in which it has traditionally functioned, i.e., the tort law, and in those areas in which the legislature has primary or plenary power, i.e., the creation and definition of crimes and penalties. It is in this context that *Baldwin*, in which we recognized the right to file a wrongful death action on behalf of a viable unborn child, must be considered. This Court in *Baldwin* was operating in its common law tort tradition, aided by the provisions of our Wrongful Death Act, W.Va.Code, 55–7–5 through –8, which we noted has historically been liberally construed because the Act is remedial.

■ Furthermore, we believe there are fundamental policy reasons why it is appropriate for this Court to defer the creation of new crimes to the legislature. First, besides having the primary right to create new crimes, the legislature is composed of persons proportionately elected at more frequent intervals than are the members of this Court. Obviously, the legislature is more closely attuned to and representative of the public will than this Court. Second, in the creation and definition of a new crime, the legislature is able to make more discreet distinctions as to the degrees of the offenses and to graduate the penalties to match the severity of the offenses whereas this Court would be limited to the facts before it and could only apply the newly created crime prospectively. *See Bouie v. Commonwealth*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

An excellent illustration of the legislature exercising its criminal law authority is our sexual offense statute, W.Va.Code, 61–8B–1 through –12, which supplanted W.Va. Code, 61–2–15, our former rape statute. The rape statute evolved from the common law and provided hardly any graduation in the offense. As a consequence, rape convictions were difficult to obtain. *See State v. Reed*, 166 W.Va. 558, 563, 276 S.E.2d

---

tution of this State, shall continue in force within the same, except in those respects wherein it was altered by the general assembly of Virginia before the twentieth day of June, eighteen hundred and sixty-three, or has been, or shall be, altered by the legislature of this State."

**9.** We also stated in Syllabus Point 2 of *Morningstar:* "Article VIII, Section 13 of the West Virginia Constitution and W.Va.Code, 2–1–1, were not intended to operate as a bar to this Court's evolution of common law principles, including its historic power to alter or amend the common law."

313, 317–18 (1981).[10]

We have on occasion altered common law rules in the criminal field, but in these cases the alteration was of a procedural nature and did not create a new class or category of crime. For example, in *State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346 (1980), we concluded that aiders and abettors and accessories before the fact could be indicted as principals in the first degree. Part of our reasoning was based on the fact that the legislature had abolished any distinction between these categories by mandating that the punishment be the same for each of the categories. W.Va. Code, 61–11–6. In *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979), we concluded that venue in a criminal case is not an element of the substantive criminal offense and, therefore, it may be proved by a preponderance of the evidence. *See also State v. Grimmer,* 162 W.Va. 588, 593–94, 251 S.E.2d 780, 785 (1979), *overruled on other grounds, State v. Petry, supra.*

■ There is a considerable difference between this Court making alterations in criminal procedure or practice rules, authorized under our constitutionally recognized rulemaking power,[11] and creating a new crime.

Since the submission of this case, the respondents direct our attention to two courts that have created, through their common law powers, the crime which they refer to as "feticide." In *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703 (1984), the court, in a brief opinion without any discussion of its power to create new common law crimes, held that the murder of a viable unborn child would henceforth be a crime.[12]

In *Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324 (1984), by a 4–3 opinion, the court held that its vehicular homicide statute was sufficiently broad to permit prosecution for the death of a viable unborn child. Both *Horne* and *Cass* made their rulings prospective, citing *Bouie v. Commonwealth, supra,* so that neither of the defendants could be prosecuted under their newly formulated crimes. The dissent in *Cass* pointed to the familiar rule that criminal statutes must be strictly construed [13] and termed the majority's opinion as "an inappropriate 'exercise of raw judicial power.'" 392 Mass. at 809–810, 467 N.E.2d at 1330.

■ We are not persuaded by the reasoning of *Horne* or *Cass* and believe that a proper exercise of judicial restraint forbids us from following their course. We, therefore, conclude that neither our murder stat-

---

**10.** Legislatures in a number of states have modified the common law born-alive rule by enacting statutes that establish criminal penalties for the murder of a viable unborn child. *See* Cal.Penal Code § 187 (West 1970); Fla.Stat. § 782.09 (1971); Ill.Rev.Stat. ch. 38, § 9–1.1 (1981); Miss.Code Ann. § 97–3–37 (1942); Okla. Stat.tit. 21, § 713 (1910); R.I.Gen.Laws § 11–23–5 (1975). In California and Illinois, the respective statutes were apparently legislative responses to *Keeler v. Superior Court,* 2 Cal.3d 619, 470 P.2d 617, 87 Cal.Rptr. 481, 40 A.L.R.3d 420 (1970) (In Bank), and *People v. Greer,* 79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203 (1980), in which the supreme courts of those two states held that it was up to the legislature to create the crime of feticide and not the judiciary. *See* Comment, *Feticide in Illinois: Legislative Amelioration of a Common Law Rule,* 4 N.Ill. U.L.Rev. 91 (1983). Under these legislative enactments, the penalty for the murder of an unborn child is often less severe than under the regular murder statute.

**11.** Section 3 of Article VIII of the West Virginia Constitution provides, in part: "The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process practice and procedure, which shall have the force and effect of law."

**12.** *Horne* cited as its authority to create new common law crimes *State v. Brooks,* 277 S.C. 111, 283 S.E.2d 830 (1981), and *State v. Mouzon,* 231 S.C. 655, 99 S.E.2d 672 (1957). In *Brooks,* the court determined that as an element of burglary, "the intent to commit a felony" would be expanded to include the intent to commit a misdemeanor also. In *Mouzon,* there is no indication in the court's opinion that it was changing the common law to create a new crime.

**13.** We have utilized this rule in a number of cases, as illustrated by Syllabus Point 2 of *State v. Ball,* 164 W.Va. 588, 264 S.E.2d 844 (1980): "'Penal statutes must be strictly construed against the State and in favor of the defendant.' Syl. pt. 3, *State ex rel. Carson v. Wood,* 154 W.Va. 397, 175 S.E.2d 482 (1970)."

ute, W.Va.Code, 61–2–1, nor its attendant common law principles authorize prosecution of an individual for the killing of a viable unborn child. This matter must be left to the good judgment of the legislature, which has the primary authority to create crimes.

For the foregoing reasons, we grant the writ of prohibition.

Writ Awarded.

McGRAW, Justice, dissenting:

The majority's determination that the legislature's so-called primary right to define crimes and their attendant punishment warrants the Court's refusal to alter the archaic "born-alive" rule is nothing but an abdication of duty in the face of controversy. Their "decision not to decide" establishes a paradoxical injustice under the laws of this State. That is, if a viable unborn child is killed, the estate may sue for monetary damages from the wrong-doer. However, if the same child is killed under circumstances which would constitute murder or manslaughter, but for the fact that the child is still in his mother's womb, the wrong-doer is immune from criminal prosecution for the intentional killing.

In *State ex rel. Combs v. Boles*, 151 W.Va. 194, 199, 151 S.E.2d 115, 118, this Court recognized that, "Homicide is the killing of any human creature...." Whether an unborn child capable of life independent of its mother is a human creature within the context of our criminal law was the question so eagerly avoided by the majority. Yet, in *Baldwin v. Butcher*, 155 W.Va. 431, 444, 184 S.E.2d 428, 435 (1971), this Court previously recognized that, "A viable unborn child is, in fact, a biologically existing person and a living human being, because it has reached such a stage of development that it can presently live outside of the female body as well as within it." In *Baldwin*, a viable unborn child was

held to be a "person" for purposes of our wrongful death act. Today, however, for "policy" reasons the majority refuses to grant these same individuals the protections due under our criminal law. In simple terms, you can, under our law, collect but not convict.

Reliance upon a distinction between the Court's role in the evolution of tort law and criminal law as a basis for avoidance of such a serious legal issue is clearly untenable under the circumstances presented in this case. Contrary to the majority's assertion, the *Baldwin* decision was not based in an area of common law tradition. Rather, as noted in *Baldwin*, "no right of action for death by a wrongful act existed at common law, the right or cause of action for wrongful death, if maintainable, exists under and by virtue of the provisions of the wrongful death statute of this State...." 155 W.Va. at 433, 184 S.E.2d at 429.*

On the other hand, as recognized by the majority in the immediate proceeding, this State's murder statute does not define all the elements of the crime. West Virginia Code § 61–2–1 (1984 Replacement Vol.) is primarily designed to "categorize the common law crimes of murder for the purpose of setting degrees of punishment." Syl. pt. 5, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978). A decision here to defer to the legislature's "primary power" to create and define crimes, therefore, ignores the basic fact that the legislature has chosen to rely mainly upon common law principles fashioned by the courts. Certainly it cannot be a usurpation of legislative power for this Court to continue to define what has been left within the common law realm.

If there was any support for the majority's reliance upon a distinction in the common law role of the courts in the areas of criminal and tort law, it would appear that we have a greater duty to define the protections against destruction afforded a viable unborn child under our murder statute than under our wrongful death statute.

---

* The majority also cites our adoption of a form of comparative negligence in *Bradley v. Appalachian Power Company*, 163 W.Va. 332, 256 S.E.2d 879 (1979) as an example of courts' traditional role in tort law development. However, of the forty-two states which have adopted comparative negligence, only ten have done so by court decision. *See Hilen v. Hays*, 673 S.W.2d 713, nn. 3 & 4 (Ky.1984).

Accordingly, this Court could abrogate the archaic "born alive" rule while still protecting women's fundamental right of privacy in their own bodies by declaring that intentional acts, unconsented to by the mother, which result in the injury or death of a viable fetus may be punished under the criminal laws of this State where all requisite elements, including viability, are proven beyond a reasonable doubt.

This is not an instance of a recent problem where the legislature has not had adequate time or opportunity to act. Various state legislatures, beginning with the New York State Legislature over 150 years ago, have ameliorated the harsh consequences of the "born alive" rule. *See* Westerfield, *The Born Alive Doctrine: A Legal Anachronism,* 2 So.Univ.L.Rev. 149 (1976). The majority, however, prefers to remain quiescent, perpetuating this injustice in the blind confidence that the problem will eventually be addressed.

For the foregoing reasons, I respectfully dissent.

McHUGH, Justice, dissenting:

In this tragic case, a pregnant woman was robbed and killed in her home. She was 37 weeks pregnant. Her unborn child died within minutes of her death. In cases of this nature, the death of neither the mother nor the unborn child should go unpunished. While I agree with the majority that this State's murder statute "does not define the substantive elements of murder" and that common law has *traditionally* declared that "an unborn child cannot be the victim of murder," this Court could properly determine that an individual could be prosecuted for the killing of a viable unborn child. I therefore respectfully dissent.

The Supreme Judicial Court of Massachusetts in *Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324 (1984), had before it a statute which provided that whoever operates a motor vehicle while under the influence of intoxicating liquor or marihuana, etc., and causes the death of another "person," shall be guilty of "homicide by a motor vehicle." The defendant, while driving a motor vehicle, struck a pregnant female pedestrian and caused the death of the pedestrian's viable fetus.

The court in *Cass* held that a viable fetus is a "person" under the statute in question. In so holding, the court rejected the assertion that it was unable to develop common law rules of criminal law where the legislature had promulgated criminal law statutes. The court also rejected the assertion that, by using the term "person" in the vehicular homicide statute, the legislature intended to crystallize the preexisting, limited definition of "person" at common law. Finally, the court concluded that the rule of strict construction of criminal statutes did not prevent the court from construing the word "person" to include viable fetuses. 392 Mass. at 803, 467 N.E.2d at 1327. The court in *Cass* stated:

> We think that the better rule is that infliction of prenatal injuries resulting in the death of a viable fetus, before or after it is born, is homicide. If a person were to commit violence against a pregnant woman and destroy the fetus within her, we would not want the death of the fetus to go unpunished. We believe that our criminal law should extend its protection to viable fetuses.

392 Mass. at 807, 467 N.E.2d at 1329.

In *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703 (1984), the Supreme Court of South Carolina held that an action for criminal homicide could be maintained for the death of a viable unborn child. The court in *Horne* stated: "The fact this particular issue has not been raised or ruled on before does not mean we are prevented from declaring the common law as it should be." 282 S.C. 447, 319 S.E.2d at 704.

It seems inconsistent to me to declare that "an action may be maintained by the personal representative of a viable unborn child for the wrongful death of such child" [*Baldwin v. Butcher,* 155 W.Va. 431, 184 S.E.2d 428 (1971)] and, yet, not recognize the death of such child in the context of criminal prosecution. That inconsistency

was discussed in the *Cass* and *Horne* cases.[1]

The common law "must be forever on progress; and no limits can be assigned to its principles or improvements."[2] I would hold that this Court could properly determine that an individual could be prosecuted for the killing of a viable unborn child.

1. *Compare Summerfield v. Superior Court, Maricopa County,* 144 Ariz. 467, 698 P.2d 712 (1985), and *Werling v. Sandy,* 17 Ohio St.3d 45, 476 N.E.2d 1053 (1985). Although *Summerfield* and *Werling* distinguish civil from criminal cases, both hold that recovery may be sought where a "viable fetus" is negligently injured and subsequently stillborn.

2. In truth, the common law, as a science, must be forever in progress; and no limits can be assigned to its principles or improvements. In this respect it resembles the natural sciences, where new discoveries continually lead the way to new, and sometimes to astonishing, results. To say, therefore, that the common law is never learned, is almost to utter a truism. It is no more than a declaration, that the human mind cannot compass all human transactions. It is its true glory, that it is flexible, and constantly expanding with the exigencies of society; that it daily presents new motives for new and loftier efforts; that it holds out forever an unapproached degree of excellence; that it moves onward in the path towards perfection, but never arrives at the ultimate point.
Story, Joseph, *The Miscellaneous Writings of Joseph Story,* edited by William W. Story (Boston: Charles C. Little and James Brown 1852), p. 526.