No. 15-0021 - State v. Louk

**FILED**

**May 27, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, J., dissenting:


Olivia Ann Vangeline Louk was eleven days old when she died as a result of her mother's neglect. West Virginia Code § 61-8D-4a provides that the mother's conduct constitutes a felony punishable by a three-to-fifteen-year term of imprisonment. Yet, the majority, undoubtedly persuaded by the amici, has decided that no crime was committed because the neglect occurred before Olivia was born. While it is certainly not unusual for this Court to be presented with intensely emotional issues, this case in particular amplifies the Court's challenge to render justice in the face of facts that touch upon deeply personal and diversely-held beliefs. Our role in this case was the same as it is in all others: to apply the law in accordance with our established principles of jurisprudence. The majority's result-oriented analysis proves, however, that it allowed policy implications and social ramifications to play a role in its decision. The rule of law commanded one outcome in this case–affirming the petitioner's conviction. Because the majority has utterly disregarded the plain language of West Virginia Code § 61-8D-4a and vacated the petitioner's conviction, I dissent.


It is undisputed that Olivia was born alive on June 12, 2013, and subsequently died as a result of her mother's injection of methamphetamine into her bloodstream just

1

hours before Olivia was born. While Olivia was delivered by emergency Cesarean section, the treating physician testified that the pregnancy was "full term."[1] There is no evidence that Olivia had a congenital defect that would have otherwise prohibited her from living a normal, healthy life. Olivia only lived eleven days because the methamphetamine injection caused her mother to suffer respiratory distress that inevitably deprived Olivia of oxygen for a significant period of time resulting in irreversible brain damage. There is no question that Olivia's death was caused by her mother's decision to neglect her child's welfare, a fact that her mother readily acknowledged. When asked if she considered Olivia's welfare when she took the illegal drug, the petitioner confessed, "I didn't and I should have." She attributed her behavior to "stupidity."

West Virginia Code § 61-8D-4a provides that "if any parent . . . shall neglect a child under his or her care, custody or control and by such neglect cause the death of said child, then such parent . . . shall be guilty of a felony." West Virginia Code § 61-8D-1(2) defines "child" as "any person under eighteen years of age not otherwise emancipated by law." This Court has long held that "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959).

---

[1]The petitioner's medical records indicate she was scheduled to undergo a Cesarean section on June 26, 2013.

There is no ambiguity concerning the application of the relevant statutory provisions to the facts of this case. At the age of eleven days, Olivia was a child within the meaning of W.Va. Code § 61-8D-1(2), and she died as a result of neglect by her mother.

Rather than apply the law as written by the Legislature, the majority chose to focus on the fact that the neglect that caused Olivia's death occurred before she was born. Under the plain language of the statute, this fact is immaterial. West Virginia Code § 61-8D-4a contains no requirement that the neglect that causes death be inflicted on the child after birth. Moreover, our common law provides that if a "child is born alive, and dies by reason of injuries received in the womb, or in the act of birth, the person who deliberately inflicted those injuries may be guilty of murder." *State ex rel. Atkinson v. Wilson*, 175 W.Va. 352, 353, n.3, 332 S.E.2d 807, 808, n.3 (1984) (quoting 4 S. Stephen, Commentaries on the Laws of England 58 (1914)). Referred to as the "born alive" rule, this common law has been a part of our jurisprudence since West Virginia first became a State in 1863. In *Adkinson,* this Court was confronted with the opportunity to extend the "born alive" rule to the death of an unborn child. Recognizing that only the Legislature has the authority to change the common law, this Court refused to alter the "born alive" rule to create criminal liability for the murder of a viable unborn child. *Id.* at 356, 332 S.E.2d 812.

West Virginia Code § 2-1-1 provides that the common law of England "shall continue in force" unless altered by the West Virginia Legislature. Accordingly, this Court has held that "'"[t]he common law is not to be construed as altered or changed by statute, unless legislative intent to do so be plainly manifested." *Shifflette v. Lilly*, 130 W.Va. 297, 43 S.E.2d 289 [1947].' Syllabus Point 4, *Seagraves v. Legg*, 147 W.Va. 331, 127 S.E.2d 605 (1962)." Syl. Pt. 4, *State ex rel. Van Nguyen v. Berger*, 199 W.Va. 71, 483 S.E.2d 71 (1996). There is no evidence that the Legislature intended to alter the application of the common law "born alive" rule through its statutory definition of "child" in West Virginia Code § 61-8D-1(2).

In construing a statute, we "presume[] that the legislators who drafted and passed it were familiar with all existing law applicable to the subject-matter, whether constitutional, statutory, or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith." Syl. Pt. 5, in part, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908). Moreover, "[o]ne of the axioms of statutory construction is that a statute will be read in context with the common law unless it clearly appears from the statute that the purpose of the statute was to change the common law." Syl. Pt. 2, *Smith v. West Virginia State Bd. of Educ.,* 170 W.Va. 593, 295 S.E.2d 680 (1982). Given that there is no indication in either West Virginia Code § 61-8D-4a or West Virginia Code § 61-8D-1(2) of legislative intent to

4

abrogate the common law "born alive" rule, there is no basis to conclude that the petitioner cannot be held criminally liable for Olivia's death.

Other "American courts . . . have in the absence of specific inclusive statutory language unanimously refused to abandon th[e] born alive rule in criminal cases." *People v. Bolar*, 440 N.E.2d 639, 644 (Ill. App. Ct. 1982). Indeed, based on the "born alive" rule, other jurisdictions have expressly held "it is not necessary that all of the elements of a criminal offense be immediately satisfied at the time of the defendant's conduct." *Cuellar v. State*, 957 S.W.2d 134, 139 (Tx. Ct. App. 1997). *See also Ranger v. State*, 290 S.E.2d 63, 66 (Ga. 1982) (affirming felony murder conviction based on evidence infant victim survived twelve hours before dying as result of premature delivery caused by shooting of mother); *Jones v. Commonwealth.*, 830 S.W.2d 877, 879 (Ky. 1992) (upholding manslaughter conviction because "the victim was a fetus when the criminal act occurred, but a person when death occurred so the criminal act resulted in the death of person"); *Williams v. Maryland*, 561 A.2d 216, 219 (Md. 1989) (concluding "criminal infliction upon a pregnant woman of prenatal injuries resulting in the death of her child after live birth may constitute manslaughter" pursuant to common law "born alive" rule); *New Jersey v. Anderson*, 343 A.2d 505, 509 (N. J. Super. Ct. Law Div. 1975) (stating "fetuses which are the victims of a criminal blow or wound upon their mother and are subsequently born alive, and thereafter die by reason of a chain of circumstances precipitated by such blow or wound, may be

5

victims of murder"); *People v. Hall*, 557 N.Y.S.2d 879, 883 (N.Y. App. Div. 1990) (finding evidence established infant victim was born alive and thus was "person" within meaning of homicide statutes).

The majority's reliance upon West Virginia Code § 61-2-30, known as the Unborn Victims of Violence Act ("Act"), to support its conclusion that the "born alive" rule has been abrogated is misplaced. The Act governs prosecution of persons who injure or cause the death of unborn children by committing certain violent crimes set forth in Chapter 61, Article 2 of the West Virginia Code. As such, the Act serves to expand the common law "born alive" rule to include unborn children. The exemption for acts or omissions of pregnant women set forth in the Act only applies to those crimes of violence set forth in Chapter 61, Article 2 of the West Virginia Code. The exemption does not apply to the crime committed by the petitioner–child neglect causing death.

Holding the petitioner criminally liable for causing Olivia's death does not offend due process notions of fundamental fairness or render West Virginia Code § 61-8D-4a impermissibly vague. The majority's conclusion that the petitioner could not have reasonably known that she could be prosecuted for her prenatal conduct is absurd. The petitioner engaged in criminal activity–the use of illegal drugs–and caused the death of her child. It is common knowledge that use of illegal substances by pregnant mothers subjects

6

their unborn children to a high risk of injury. The petitioner readily admitted she knew injecting methamphetamine into her vein would put Olivia at risk. She simply chose to completely disregard Olivia's welfare. She should be held accountable for her actions.

While the majority and amici insist that affirming the petitioner's conviction would result in future prosecutions of pregnant mothers who engage in lawful, low-risk activities that are contraindicated during pregnancy and cause harm to their children, there is no basis for that conclusion. In that regard, West Virginia Code § 61-8D-1(7) defines "neglect" as "the *unreasonable* failure by a parent, guardian or custodian of a minor child to exercise a *minimum* degree of care to assure the minor child's physical safety or health." (emphasis added). This Court has observed that this definition is sufficient to "give[] a person of ordinary intelligence fair notice that his or her contemplated conduct is *prohibited* and it also provides adequate standards for adjudication." Syl. Pt. 3, in part, *State v. DeBerry*, 185 W.Va. 512, 408 S.E.2d 91 (1991) (emphasis added). The laundry list of legal activities that the majority and amici claim may be subject to prosecution if the petitioner's conviction were affirmed simply does not correspond to the certainty of injury that results from exposure to a controlled substance such as methamphetamine. More importantly, it is this Court's duty to apply the law as written and not to consider whether our decision will yield prosecutions which militate against the various public policy concerns expressed by the

7

amici. As the petitioner herself ardently insists, such determinations are reserved to the Legislature.

Judicial challenge "'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *MacDonald v. City Hosp., Inc.*, 227 W.Va. 707, 722, 715 S.E.2d 405, 420 (2011) (quoting *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). Therefore, it is not for this Court to speak to whether it should or should not be a crime for a mother to engage in criminal activity which injures a child in utero that is later born alive and subsequently dies–the law reveals that it is–and thus ends this Court's charge.

Accordingly, I respectfully dissent. I am authorized to state that Justice Workman joins in this dissent.